María Vázquez de Hernández Usera, demandante y recurrida, *v.* Secretario de Hacienda de Puerto Rico, demandado y recurrente.

*Número:* 240      *Resuelto:* 14 de septiembre de 1962

14

*J. B. Fernández Badillo, Procurador General, y Carlos G. Lati-mer, Procurador General Auxiliar,* abogados del recurrente; *Jorge Luis Córdova Díaz,* abogado de la recurrida.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Mediante escritura número 7 de 27 de abril de 1943 otorgada ante el notario don Salvador Suau Carbonell, doña Encarnación Aboy viuda de Cintrón, quien a la sazón residía temporalmente en la ciudad de Nueva York, representada por su apoderado don José Hernández Usera, figuró el traspaso de dos bienes inmuebles sitos en Santurce a favor de don José Luis Hernández Vázquez. A pesar de que en dicho documento público denominado "compraventa" se consignó un precio total de $143,041.00, que el apoderado de la transmitente confesó haber recibido con anterioridad al otorgamiento, se admite que no medió causa onerosa alguna en el contrato. Dos meses después, el adquirente Hernández—mediante la escritura número 12 de 28 de junio siguiente ante el mismo notario—transfiere a su madre, la recurrida doña María Vázquez de Hernández Usera, los dos inmuebles de referencia, con igual confesión sobre el recibo con anterioridad al acto del precio que se figuró en el contrato, también denominado de compraventa. Asimismo se admite que tampoco medió causa onerosa alguna para este traspaso. Convienen las partes que en realidad los dos contratos mencionados se otorgaron para encubrir la donación que de los inmuebles se hizo por su dueña original doña Encarnación Aboy viuda de Cintrón a favor de su sobrina y ahijada doña María Vázquez de Hernández Usera.(¹)  ■

---

(¹) Aparentemente, debido a la ausencia de Puerto Rico de la señora Aboy, y a la necesidad de que en su representación compareciera al otorgamiento de la escritura su apoderado, señor Hernández Usera, ante la posibilidad de que se levantara reparo para la inscripción del documento, por ser éste el cónyuge de la donataria, se optó por llevar a cabo la transacción en la forma expuesta. Véase artículo 1348 del Código Civil, ed. 1930, 31 L.P.R.A. sec. 3773, y *Latallade* v. *Registrador*, 66 D.P.R. 685 (1946), en donde se resolvió que un apoderado no puede vender a su propia esposa bienes del mandante, porque, siendo ambos los beneficiarios de la adquisición, se aplica la prohibición contenida en el artículo citado.

Se estableció además que después del traspaso indicado la recurrida percibía los réditos de los inmuebles, los cuales se incluían en sus declaraciones anuales de ingresos, y que satisfacía las contribuciones territoriales impuestas sobre los mismos.

La señora Aboy falleció en 16 de agosto de 1949 bajo testamento ológrafo en el cual, después de disponer numerosos legados, instituyó a la recurrida como única y universal heredera.(²)  Notificada la defunción a los fines de la determinación y liquidación de la contribución sobre herencia, el Secretario de Hacienda incluyó entre los bienes del caudal los dos inmuebles que fueron objeto de los traspasos descritos precedentemente, fundándose en que éstos eran simulados, y, por tanto, continuaban formando parte del patrimonio relicto al fallecimiento de la testadora.  Los valoró en $345,930.00 y notificó una contribución de $96,547.32 a la recurrida por su participación hereditaria.  ■

Se entabló acción judicial para impugnar esta determinación administrativa, y después de un juicio en los méritos, el tribunal a quo declaró con lugar la instancia,(³) después de determinar como cuestión de hecho que la testadora "realizó un acto de liberalidad y dispuso gratuitamente de los inmuebles en cuestión, en favor de la demandante, que los aceptó."

Los novedosos planteamientos que levanta el Secretario de Hacienda en el presente recurso de revisión de la sentencia que le fuera adversa nos obligan a discutir, aunque brevemente, el estimulante tema de la simulación contractual, y su adjunto, la interposición de persona en los contra-

---

(²) En *Wolff* v. *Hernández*, 76 D.P.R. 650 (1954), aparece el historial de este singular testamento, fecundo en litigios interesantes.

(³) Para la fecha en que se otorgaron las escrituras mencionadas, la ley vigente—Artículo 1 de la Ley Núm. 99 de 29 de agosto de 1925, según enmendada por la Ley Núm. 72 de 12 de mayo de 1936 (Leyes, pág. 371)— no imponía contribución sobre las donaciones *inter vivos*.

1. El concepto de la simulación relativa contractual halla expresión en las disposiciones del artículo 1228 del Código Civil, ed. 1930, 31 L.P.R.A. sec. 3433, que textualmente preceptúa que "La expresión de una causa falsa en los contratos dará lugar a la nulidad, si no se probase que estaban fundados en otra verdadera y lícita." Contrario a lo que ocurre en el supuesto de simulación absoluta, en que se pretende la configuración aparente de un acto ficticio o inexistente, (4) en la modalidad relativa el negocio aparente encubre otro real que los contratantes desean sustraer a la curiosidad e indiscreción de terceros. De ahí que el negocio fingido o disimulado precise la existencia de una causa lícita. (5)   El ejemplo más frecuente de simulación relativa es el caso de la donación subyacente en un contrato simulado de compraventa, en donde si bien existe una divergencia entre la apariencia del acto y su contenido real, se sostiene fundado en la causa verdadera que no es otra que "la mera liberalidad del bienhechor," artículo 1226 del Código Civil, 31 L.P.R.A. sec. 3431.   En *García* v. *Central Alianza,* 69 DP.R. 916 (1949) ; *Latorre* v. *Cruz,* 67 D.P.R. 743 (1947) ; *Sucn. Gómez* v. *Colón,* 63 D.P.R. 104 (1944) ; *Totti* v. *Fernández,* 40 D.P.R. 636 (1930) ; *Sosa* v. *Sosa,* 35 D.P.R. 1025 (1926) ; *Cabanillas* v. *Cabanillas,* 33 D.P.R. 777 (1924) ; *Ríos, et al.* v. *Amorós, et al.,* 27 D.P.R. 804 (1919) ; *Martínez* v. *Cerezo,*

---

(4) La simulación absoluta se manifiesta casi siempre en el propósito de lograr una disminución de patrimonio para sustraer bienes de la acción de los acreedores o para aumentar el pasivo.   Los autores aluden a los casos específicos de la quiebra, con sus ineludibles consecuencias económicas graves, y a la defraudación contributiva.   Rodríguez-Arias, *En Torno del Negociado Indirecto y Figuras Jurídicas Afines,* Revista General de Legislación y Jurisprudencia (1949), tomo 185, pág. 276, 285.

(5) Cuando la causa del contrato simulado es ilícita, éste es inexistente y no produce efectos jurídicos.   Véanse, Sentencias del Tribunal Supremo de España de 20 de octubre de 1961 (Aranzadi, *Repertorio de Jurisprudencia,* tomo XXVIII, núm. 3607; Revista de Derecho Privado, tomo 45, pág. 1065) ; 9 de diciembre de 1959 (Aranzadi, *op. cit.,* tomo XXVI, núm. 4492, Revista de Derecho Privado, tomo 44, pág. 121) ; 7 de octubre de 1958 (Aranzadi, *op. cit.,* tomo XXV, núm. 3406, Revista de Derecho Privado, tomo 43, pág. 44).

25 D.P.R. 709 (1917) ; *Amy, et al.* v. *Amy, et al.*, 15 D.P.R. 415 (1909) ; *Altuna* v. *Ortiz, et al.*, 11 D.P.R. 46 (1906), hemos considerado situaciones de simulación contractual. Véase especialmente, *Guzmán* v. *Guzmán*, 78 D.P.R. 673 (1955). Véase también, Manresa, *Comentarios al Código Civil Español* 5a. ed., (1950), tomo VIII, págs. 459–462; Borrell y Soler, *Nulidad de los Actos Jurídicos según el Código Civil Español* (1947), págs. 81–87; Tomás Presa, *La Simulación*, Revista General de Legislación y Jurisprudencia, (1930) tomo 157, pág. 41; Evelio Verdera, *Algunos Aspectos de la Simulación*, Anuario de Derecho Civil (1950) vol. 3, pág. 22 y ss. ▆▆▆

La simulación puede afectar la naturaleza, el contenido o los sujetos del contrato. Para los fines del presente caso sólo nos interesa la que se refiere a los sujetos del contrato, y que se manifiesta mediante la interposición de persona. Dejemos que Ferrara[6] fije los límites de esta figura jurídica:

"Al celebrarse un negocio jurídico, cabe que se interponga una persona extraña con el fin de ocultar al verdadero interesado. Esta persona sirve de intermediario, de eslabón entre los que quieren conseguir los efectos de un acto jurídico. Los caracteres que la distinguen, en general, son: 1º Ponerse entre dos que deben ligarse directamente en el negocio, o entre los cuales debe descansar en definitiva el contenido patrimonial del mismo, sin que el intermediario tenga en el negocio un interés personal. 2º Su función de ocultar al verdadero dueño del negocio, que quiere permanecer entre bastidores."

Acto seguido procede el eminente civilista italiano a considerar la división de las personas interpuestas en dos grandes categorías, a saber: personas interpuestas reales y personas interpuestas simuladas. El primero interviene en el contrato "como contratante efectivo—entablando la relación jurídica en su propio nombre y convirtiéndose de este modo

---

[6] Francisco Ferrara, *La Simulación de los Negocios Jurídicos*, (Ed. Revista de Derecho Privado) 1953, pág. 272.

en titular de los derechos y obligaciones que derivan de la misma para inmediatamente volverlos a transferir al dueño del negocio, que se ha mantenido apartado de éste—" (pág. 273); el segundo, interviene "por mera apariencia, como contratante ficticio, cuando en realidad la relación se establece entre el tercero y el interesado, que no comparece en el contrato," (id.) y que se denomina indistintamente intermediario fingido, testaferro o prestanombre. (Véase, además, Bonet Ramón, *Algunas Figuras Afines al Contrato de Mandato*, Revista General de Legislación y Jurisprudencia. (1948) tomo 184, pág. 633, 648–651.) Y añade:

"Señalando brevemente el concepto de la interposición ficticia, examinemos sus requisitos. Para la formación del negocio sólo se necesita la intervención jurídica de dos personas: los verdaderos contratantes, uno de los cuales obra con nombre supuesto. La persona interpuesta es extraña a la relación, y, descubierta la simulación, se evapora por completo. Cuando más, dicha persona presta una simple cooperación material, que puede consistir en la mera comparecencia personal como parte de contrato para perfeccionar la *mise en scene* y repetir mecánicamente la declaración que se le dicta al oído. Por ello, los vicios del consentimiento, la capacidad, etc., han de apreciarse en el contratante secreto, y no en la persona interpuesta." (Pág. 281.) ▮

Parece claro de lo expuesto que la relación se crea directamente entre el contratante visible y el contratante oculto, cuyo patrimonio es el que recibe los efectos del contrato. El intermediario es un extraño al vínculo engendrado en virtud de la relación contractual; de ahí, que podamos hacer abstracción de su presencia a los fines de determinar los efectos jurídicos de la transacción. ▮

Aplicando los anteriores principios a la situación de autos, resulta claro que la ausencia de causa onerosa en los traspasos mencionados no vicia de inexistencia el contrato, porque ambos descansan en otra lícita y verdadera—el acto de liberalidad de la donante. Y en cuanto a la participación de don José Luis Hernández, califíquesele como un interme-

diario utilizado por las partes para llevar a cabo un propósito lícito; (⁷) un mero prestanombre cuya interposición se esfuma al considerar la transacción en conjunto. Disponemos así de la contención del recurrente al efecto de que la prueba a lo sumo estableció el deseo de la señora Aboy de hacer donación de los inmuebles a la recurrida, pero no al hijo de ésta, y que, como el primer traspaso fue a favor de este último, resulta absolutamente nula la primera escritura por ausencia total de causa, y por ende, la transmisión que hizo el allí adquirente a la recurrida. Fallamos, pues, que se trata de una donación disimulada mediante dos contratos fingidos de compraventa. (⁸)

2. Finalmente, arguye el recurrente que, como el requisito de que la donación se haga mediante escritura pública (artículo 575 del Código Civil, ed. 1930, 31 L.P.R.A. sec. 2010) no es una mera formalidad, sino que se refiere a la existencia misma del acto de liberalidad, y de la misma debe

---

(⁷) En el presente caso no nos encontramos frente a la situación de la compraventa simulada otorgada con la exclusiva finalidad de defraudar los derechos legitimarios de otros herederos, en cuyo caso procedería declarar también inexistente la donación por ser ilícita su causa, pues según aparece de la relación de hechos, la recurrida, a quien consideramos como donataria, fue instituida como única y universal heredera en el testamento de la donante, que carecía de herederos forzosos. Véase, Sentencia del Tribunal Supremo de España de 20 de octubre de 1961 (Aranzadi, *op. cit.*, tomo XXVIII, núm. 3607; Revista de Derecho Privado, tomo 45, pág. 1065).

(⁸) La Ley de Contribución sobre Herencia vigente, Núm. 303 de 12 de abril de 1946, dispone en la sección 10 (c), 13 L.P.R.A. sec. 891 (c), que:

"(c) Toda transferencia hecha por una persona de más de 50 años de edad, o dentro de los dos años anteriores al fallecimiento del causante, a favor de sus hijos, descendientes, parientes, o cualesquiera otros objetos naturales de su liberalidad, se presumirá que es una donación, a menos que el contribuyente demuestre que

"(1) la transferencia se hizo por causa buena y adecuada en dinero o su equivalente en valor, y

"(2) dicha causa se derivó, directa o indirectamente, de los ingresos del donatario, o de propiedad adquirida con anterioridad a la aprobación de esta sección, o de una donación por la cual se pagó contribución de acuerdo con las secs. 881 a 905 de este título, o de otra fuente legal."

aparecer claramente el *animus donandi* y la aceptación del donatario (artículo 571 del Código Civil, ed. 1930, 31 L.P.R.A. sec. 2006), "una escritura de compraventa simulada difícilmente puede reunir los requisitos *sine qua non* para la existencia de una donación."

El Tribunal Supremo de España, en sentencia dictada en 5 de noviembre de 1956 (Aranzadi, *op. cit.*, tomo XXIII, núm. 4114; Revista de Derecho Privado, tomo 40, pág. 1214), de la que fue ponente el magistrado don Francisco Bonet Ramón, expone la doctrina imperante en la siguiente forma: (⁹) ▆

"Según declara la sentencia de 3 de marzo de 1932, si bien al amparo del art. 1.276 del Código Civil, pueden ser admitidos los negocios disimulados, o sean los actos válidos y tácitos encubiertos por contratos aparentes, pero privados de la causa específica a que va unida su existencia, es necesario para que aquéllos produzcan plenos efectos, que se justifique no sólo la concurrencia de los indispensables elementos personales de capacidad y consentimiento, así como la existencia del objeto en que han de apoyarse las relaciones obligatorias o reales ciertamente concertadas, sino también la causa verdadera y lícita en que se funde el acto que las partes han querido ocultar y *el cumplimiento de las formalidades que la Ley exigiría a quienes actuaran paladinamente, rigurosa doctrina* que ha de ser

---

(⁹) En el mismo sentido al efecto de que cuando los contratos encubren negocios disimulados implicativos de donación precisa probar su existencia en la forma que prescribe el artículo 633 del Código Civil Español, que corresponde al 575 de Puerto Rico, véanse las siguientes sentencias recientes del Tribunal Supremo de España:

20 de octubre de 1961 (Aranzadi, *op. cit.*, XXVIII, núm. 3607; Revista de Derecho Privado, tomo 45, pág. 1065.

19 de diciembre de 1960; Revista de Derecho Privado, tomo 45, pág. 145.

9 de diciembre de 1959 (Aranzadi, *op. cit.*, XXVI, núm. 4492; Revista de Derecho Privado, tomo 44, pág. 121.

19 de octubre de 1959 (Aranzadi, *op. cit.*, XXVI, núm. 4872; Revista de Derecho Privado, tomo 44, pág. 299.

7 de octubre de 1958 (Aranzadi, *op. cit.*, XXV, núm. 3406; Revista de Derecho Privado, tomo 43, pág. 44.

5 de octubre de 1957 (3 Jurisprudencia Civil, tomo 62, pág. 780; Revista de Derecho Privado, tomo 42, pág. 47.

especialmente impuesta, con arreglo a la tradición española, en el campo de las donaciones puras y simples de inmuebles, por reflejar los hechos *inter vivos* más que un modo abstracto e independiente de transferir la propiedad, un acto liberal que atribuye el dominio al donatario gratuitamente y que por significar una merma, sin contraprestación, del patrimonio del donante, y su enriquecimiento sin gravamen, del beneficiario, requiere requisitos y solemnidades que protejan al transferente contra sus desordenados impulsos, a su cónyuge, herederos y acreedores contra las lesiones de los derechos que el régimen económico familiar, la ley sucesoria o el principio patrimonial le confieren, y al donatario contra los riesgos de una adquisición en apariencia precaria o por lo menos desprovista de las defensas que las obligaciones recíprocas y los actos formales ponen en juego, habiendo de hacerse para que sea válida la donación de cosa inmueble, a tenor del art. 633 del Código Civil, en escritura pública, con expresión de los bienes donados y el valor de las cargas que deba satisfacer el donatario, pudiendo formalizarse la aceptación en la misma escritura u otra separada, y aunque con tales preceptos no se cierra el paso a toda donación que pretenda llevarse a cabo en un instrumento público de compraventa, los intereses más arriba mencionados no quedan a salvo, si los elementos jurídicos que integran el acto disimulado y en especial el acuerdo de voluntades sobre gratuidad, alcance y condiciones de la transferencia, no son puestos de relieve de una manera indiscutible y auténtica." ■

Es lógico que si el cumplimiento de los requisitos formales es necesario en las donaciones puras y simples, con mayor razón lo han de ser en las encubiertas o disimuladas que, por serlo, no es posible ser menos exigente en cuanto a sus formalidades. Después de una amplia exposición para controvertir la doctrina de la jurisprudencia francesa que sostiene que la donación encubierta puede hacerse prescindiendo de los requisitos formales exigidos para la donación directa, Ferrara, *op. cit.*, pág. 235, concluye que "la donación disfrazada, no hecha por instrumento público, es nula; pero, si se revistió de tal forma, no puede negarse su validez." ■

En cuanto al requisito de aceptación, se expresa en la Sentencia de 26 de junio de 1961 (Aranzadi, *op. cit.*, tomo XXVIII, Núm. 2745; Revista de Derecho Privado, tomo 45, pág. 744), que "es preciso la aceptación, no sólo del contrato simulado, sino también del disimulado, con todos los requisitos extrínsecos y formales precisos para la validez del último, *sin que,* como es lógico, *pueda exigirse la expresión categórica de que se acepta el contrato encubierto que precisamente tratan de ocultar los contratantes,* y que quedaría al descubierto si se expresase la aceptación de la realidad jurídica, aparece evidente que aceptado por el recurrente (el donatario) su forma escrita y en el mismo documento con la fórmula de 'es conforme con el referido reconocimiento de deuda en los términos expresados' debe estimarse perfeccionada la donación y hecha por escrito y con pleno conocimiento por parte de los otorgantes de que el negocio jurídico era de liberalidad del donante, encubierto en forma de préstamo inexistente." Asimismo, se declara en la Sentencia de 16 de noviembre de 1956 (Aranzadi, *op. cit.*, tomo XXIII, Núm. 4115; Revista de Derecho Privado, tomo 41, pág. 192) que los requisitos formales en el caso de la donación encubierta se cumplen "si los otorgantes utilizaron para su convenido negocio la forma de escritura pública, y consta la aceptación de los fingidos compradores y reales donatarios, como por cierto con el empleo de ese mismo verbo se consigna en las escrituras . . ." En parecidos términos se manifiesta la Sentencia de 29 de enero de 1945 (2 Jur. Civil, tomo 9, págs. 291, 301; Revista de Derecho Privado, tomo 29, pág. 322). Laurent[10] dice que para que la donación encubierta pueda considerarse válida debe haber la aceptación del donatario, "pero sin atribuir a la palabra [aceptación] la idea especial que expresa cuando se trata de una donación solemne: es una simple manifestación de

---

[10] *Derecho Civil Francés* (1896), tomo XII, págs. 444–445.

voluntad, regida por los principios generales que rigen el consentimiento. La prueba del consentimiento, *cuando hay un escrito, resultará de la firma del donatario . . .*"

*Guzmán* v. *Guzmán*, supra, cuyos hechos son distinguibles del presente caso, ratifica el criterio sobre la necesidad de que la aceptación se produzca en la forma prescrita por la ley y que esta aceptación se ponga en conocimiento del donante. Tratábase allí de un contrato de compraventa otorgado por una madre a favor de sus dos hijas, quienes comparecieron al otorgamiento representadas por un mandatario verbal. Posteriormente una de las hijas ratificó la comparecencia hecha a su nombre, pero para tal fecha la madre había sido judicialmente declarada incapaz. Impugnada con éxito la compraventa efectuada por simulación de causa, sostuvimos que tampoco podía dársele eficacia al contrato de donación disimulada, ya que la aceptación era indebida porque a) no bastaba la hecha por el mandatario verbal tratándose de una donación de bienes inmuebles; y, b) la ratificación posterior no convalidaba el acto por haberse otorgado cuando la donante estaba incapacitada. ■

Resumiendo, pues, todo cuanto se requiere para que la donación disimulada cumpla con las formalidades legales es que el contrato simulado que la encubre se haya otorgado mediante escritura pública; que se describan individualmente los bienes donados, y en el caso de la donación onerosa, que se expresen las cargas que el donatario asume; y que se haga constar la aceptación del donatario en la misma o en otra separada, pudiendo deducirse esta aceptación de la firma del documento simulado.([11]) Todos estos requisitos se cumplen en el presente caso.

---

([11])*Santiago* v. *Rodríguez*, 72 D.P.R. 266, 275 (1951) es distinguible del caso de autos, pues allí se trataba de una supuesta donación—que luego impugnó el donante—de bienes pertenecientes a la sociedad de gananciales, sin la concurrencia de uno de los cónyuges.

En vista de todo lo expuesto, concluimos, al igual que el tribunal de instancia, que los dos bienes inmuebles que fueron incluidos por el Secretario de Hacienda a los fines de la liquidación de la contribución sobre herencia con motivo de la defunción de doña Encarnación Aboy viuda de Cintrón no formaban parte del patrimonio de ésta a la fecha de su fallecimiento por haber sido válidamente donados a la recurrida en el año 1943.

*Se confirmará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en 19 de octubre de 1959.*