CHARLIE LA COSTA SAMPEDRO, demandante y recurrido, *v.* CARMEN MARÍA LA COSTA BOLÍVAR, RICARDO LA COSTA BOLÍVAR, CARMEN BOLÍVAR VDA. DE LA COSTA, HÉCTOR NEVÁREZ y CORP. HACIENDA SAN MARTÍN, INC., demandados y recurrentes el primero, cuarto y quinto; CHARLIE LA COSTA SAMPEDRO, demandante y recurrente, *v.* CARMEN MARÍA LA COSTA BOLÍVAR y OTROS, demandados y recurridos.

*Números:* R-80-554, R-80-556 *Resueltos:* 21 de enero de 1982

*Manuel Reyes Dávila* y *José Luis Feliú Pesquera*, abogados del demandante (recurrente en el recurso R-80-556 y recurrido en el R-80-554); *Francisco Castro Amy*, abogado de los demandados Carmen La Costa Bolívar, Héctor Nevárez y Hacienda San Martín, Inc. (recurridos en el recurso R-80-556

y recurrentes en el R-80-554); *Iván Díaz De Aldrey*, de *Brown, Newsom & Córdova*, y *Frank Brunet Calaf*, abogados de la recurrida Carmen Bolívar Vda. de La Costa.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

El 4 de septiembre de 1974 falleció Don Ricardo La Costa Calaf. Le sobrevivieron su viuda Carmen Bolívar y tres hijos nombrados Ricardo y Carmen María de apellidos La Costa *Bolívar* y Charlie La Costa *Sampedro*. Este último, hijo natural reconocido, cuestionó judicialmente la venta que su padre realizó en el año 1954 de un número sustancial de las acciones mayoritarias que poseía en la Suiza Dairy, Inc., y la transacción de compraventa efectuada década y media después —el 17 de septiembre de 1970— de una finca y lechería situadas en el Municipio de Dorado a su hija Carmen María La Costa Bolívar y su esposo Héctor Nevárez. Alegó que se trataba de negocios jurídicos simulados para encubrir donaciones improcedentes a Carmen María para privarlo de sus derechos hereditarios.

Previa vista en sus méritos, el Tribunal Superior, Sala de San Juan (Hon. Wilfredo Alicea López), en reflexionado y documentado dictamen decretó *bona fide* la compraventa de la finca, pero concluyó que contenía una donación subyacente montante a $309,670, en la cual existía una porción reputada ganancial a determinarse posteriormente; ordenó a los codemandados Nevárez-La Costa y Hacienda San Martín, Inc. colacionar la parte de la donación no reputada ganancial (disponiendo que no tendría que colacionarse la mitad del inmueble donado luego de descontarse la porción que resultare ser ganancial); desestimó la demanda contra el codemandado Ricardo La Costa Bolívar, sin imposición de costas ni honorarios; retuvo jurisdicción sobre la codemandada Carmen María Bolívar Vda. de La Costa hasta la determinación de si la donación era o no inoficiosa; y no impuso costas ni honorarios.

El ilustrado foro de instancia, a la luz del examen y evaluación de la evidencia testifical y documental de las partes estimó probado, tanto en su sentencia original como en la enmendada, los hechos que a continuación resumimos.

Don Ricardo, aunque reconoció al demandante como hijo natural y lo trató y le brindó cariño, "no le prodigó las mismas atenciones que a sus restantes hijos habidos en su matrimonio con doña Carmen Bolívar, [y . . .] nunca fue aceptado en el seno de la familia La Costa-Bolívar ni invitado a dicho hogar. Estas diferencias en el trato y la falta de aceptación en dicha familia le han creado al demandante un trauma emocional que le ha dejado 'profundas huellas en su personalidad'".

La hija del causante, Carmen, y su esposo, Héctor G. Nevárez, desde que se casaron en el año 1947 fueron a vivir en la misma casa de los padres de ella en Santurce, y allí formaron y criaron su propia familia, lo cual "propició que se creara una relación familiar especial y un sólo núcleo familiar constituido por los esposos La Costa-Bolívar y Nevárez-La Costa". Además, se desarrollaron vínculos estrechos en el ámbito de los negocios por razón de que el causante era accionista y abogado de la Suiza Dairy, Inc., de cuya corporación su yerno Nevárez era accionista principal. La leche producida en una vaquería operada en la finca objeto del pleito era vendida a la Suiza Dairy. También su hija Carmen era accionista de la Farmacia Colonial, de la cual el causante era el accionista principal.

La compraventa de la finca objeto del pleito fue realizada el 17 de septiembre de 1970, mediante la escritura Núm. 25 otorgada ante el notario Daniel Pellón La Fuente. Figuran los esposos La Costa-Bolívar vendiendo a los esposos Nevárez-La Costa. Por Acta Aclaratoria del 21 de diciembre del mismo año, se clarificó y desglosó la tasación y precio de la compraventa del siguiente modo: (1) ganado vacuno, $59,040; (2) equipo y herramientas, $7,827.50; (3)

edificaciones, $48,668.50; y (4) terrenos, $489,464. Del precio total convenido los compradores entregaron en efectivo $50,263.73[1] y asumieron el pago de tres hipotecas a pagar a: (1) Puerto Rico Production ($227,592.27); (2) Federal Land Bank ($177,144); y (3) Ricardo La Costa ($150,000). Todas estas hipotecas y los intereses pactados en la compraventa a razón del 6% anual *fueron satisfechos* por los esposos Nevárez-La Costa. Posteriormente ellos —mediante la escritura número 4 del día 4 de febrero de 1972, ante el notario Luis E. Cintrón Renta— traspasaron esa finca a la corporación cerrada familiar *Hacienda San Martín* de la cual ambos son accionistas mayoritarios, y por ser poseída, administrada y custodiada por Nevárez, su esposa Carmen e hijos, realmente constituye "un álter ego" de la persona del primero.

Para la época de la aludida compraventa, los esposos La Costa-Bolívar eran personas de edad avanzada, "y los únicos que se hacían cargo de ellos eran los esposos Nevárez-La Costa, pues las relaciones familiares entre los primeros con su hijo Ricardo La Costa Bolívar eran pobres debido a los contratiempos que éste había tenido con la justicia y los acreedores que lo perseguían, que había obligado a Don Ricardo La Costa [a] gastar grandes sumas de dinero en su defensa".

Con referencia a la valoración de la finca el tribunal sentenciador rechazó la confiabilidad de las tasaciones al 17 de septiembre de 1970 realizadas por los peritos de las

---

[1] Si bien el tribunal sentenciador no se pronunció al respecto, la escasa prueba presentada tiende a sugerir, aunque no de manera concluyente, que los esposos La Costa-Bolívar no declararon ingreso sobre esta venta en la planilla correspondiente al año 1970. Por otro lado no hay evidencia sobre documento ante el Departamento de Hacienda indicativo de que ellos consideran la transacción como una donación de carácter tributable. La única prueba objetiva e incuestionable sobre este extremo, respecto al cumplimiento por los vendedores de las obligaciones fiscales, la constituyen copias de las planillas de contribución sobre ingresos para los años 1971 y 1972, en que aparecen como *intereses recibidos* de la "Finca San Martín" $9,000 en cada uno de esos períodos.

14

partes.(²) Dicho foro consignó, explicó y fundamentó su propio criterio y conclusión valorativa y —tomando como base otros indicadores tales como ventas más contemporáneas, cabida, conformación de los terrenos, carácter agrícola del área, su inundabilidad, facilidades de servicios de agua, luz, teléfono, grado de desarrollo de los pueblos adyacentes, clasificación de zonificación por la Junta de Planificación, mejoras, edificaciones y potencial de uso residencial, comercial e industrial— determinó que a la fecha de la compraventa los terrenos valían $746,496, equivalente a *$1,800* la cuerda. Coincidió con el valor de las partes en cuanto al ganado vacuno y herramientas montantes a $59,040 y $7,827.50 respectivamente. Como resultado de esa valoración, estimó una diferencia entre el valor real y precio pagado por Nevárez y su esposa en *$309,670* y determinó "que al efectuarse la compraventa de la finca que es objeto de este pleito el 17 de septiembre de 1970, por consideraciones de índole familiar y de negocios, el causante se la vendió a los esposos Nevárez-La Costa *por debajo de su justo valor en el mercado*. Por consiguiente hay *una donación subyacente* en la compraventa montante a *$309,670*, de cuya suma una porción se reputa ganancial y el balance debe colacionarse con arreglo a la ley". (Énfasis nuestro.) Además concluyó "que el hecho de que el demandante fuera hijo natural reconocido del causante y porque no fuera aceptado en el seno de su familia, sino más bien que fuera rechazado por ésta, *por sí solo no es suficiente* para inferir que dicho causante hizo una venta simulada de la finca a los esposos Nevárez-La Costa para favorecer a su hija en detrimento de los derechos hereditarios futuros del demandante. Dicha evidencia la reputa el Tribunal como insuficiente, especulativa y conjetural".

(²) El de la parte demandante concluía que el terreno valía $1,679,616 ($4,050 la cuerda) y las mejoras $200,464.90. El de los demandados valoraba el terreno en $435,456 ($1,050 la cuerda), las estructuras en $101,306.55, los muebles en $7,827.50 y el ganado vacuno en $59,040, para un gran total de $604,000.

El foro primario fundamentó jurídicamente su decreto apreciando que en las relaciones estrechas familiares y de negocios existentes entre las partes otorgantes, no era extraño que en la compraventa hubiera una donación subyacente que, aunque encubierta, se reputaba válida conforme el Art. 1226 del Código Civil, y *Hernández Usera* v. *Srio. de Hacienda*, 86 D.P.R. 13, 18 (1962), por estimarse suficiente causa contractual la liberalidad del bienhechor. Aclaró, sin embargo, que la donación así efectuada estaba sujeta a colacionarse según lo preceptuado en los Arts. 578 y 1001 del Código Civil. [3]

Rechazó expresamente la teoría del demandante de que la compraventa de la finca fue absoluta y totalmente simulada, pues, a juicio de dicho tribunal, se desfiló y aportó ante sí evidencia testifical y documental suficiente para determinar, tal y como lo hizo, que la transacción fue *bona fide*, excepto que se realizó por debajo de su justo valor en el mercado. [4]

No conformes, tanto el demandante Charlie La Costa Sampedro como los codemandados Héctor Nevárez, su esposa Carmen M., y la entidad Hacienda San Martín, Inc., recurrieron ante nos. Acordamos revisar. En vista de la similitud de varios señalamientos consolidamos ambos recursos.

---

[3] Rezan:

Art. 578: "No obstante lo dispuesto en la sec. 2021 de este título, ninguno podrá dar ni recibir, por vía de donación, más de lo que pueda dar o recibir por testamento.

"La donación será inoficiosa en todo lo que exceda de esta medida." 31 L.P.R.A. sec. 2023.

Art. 1001: "El donatario tomará de menos en la masa hereditaria tanto como ya hubiese recibido, percibiendo sus coherederos el equivalente, en cuanto sea posible, en bienes de la misma naturaleza, especie y calidad." 31 L.P.R.A. sec. 2853.

[4] El tribunal sentenciador desestimó la causa de acción relativa a la impugnación de la transacción de las acciones vendidas el 27 de enero de 1954 y pagadas al causante por Nevárez a razón de $100 cada una, para un total de $27,900, al estimar insuficiente la prueba para inferir que ello era una donación.

Aparte de que en su recurso el demandante no nos argumenta persuasivamente esta conclusión como error, el análisis integral de la prueba nos mueve a ratificar al foro de instancia.

I

El primer error alegado por todos constituye un ataque a la apreciación del tribunal a quo sobre la prueba con referencia a la conclusión de que la transacción fue una compraventa *bona fide* que incluía una donación subyacente.

El demandante sostiene básicamente que fue un contrato simulado de compraventa, con causa ilícita por tener como propósito encubrir una donación total y así perjudicarlo como heredero. En contrario los demandados sostienen que no hubo tal donación.

El análisis integral de la prueba nos mueve a concluir que el error no fue cometido. Concentrémosnos primero en los argumentos en que el demandante basa su contención y cómo los hechos sobre esos extremos fueron depurados por la sala de origen.

Inicialmente enfatiza que el ambiente existente en el hogar del finado era propicio para que se efectuara la alegada simulación. Esto a su vez lo subdivide en tres contenciones, a saber: (1) que el causante se encontraba en mal estado de salud a la fecha de la transacción; (2) que existía un gran favoritismo de su parte hacia su hija; y (3) que tanto su esposa como su hija se negaron a admitir e ignoraron la existencia del demandante hasta el año 1974, con la única intención de justificar que no medió razón alguna de perjudicarlo al realizarse la compraventa en 1970. Examinémoslas en conjunto.

En cuanto a la pobre condición física del causante el tribunal estimó fielmente que a la fecha de la venta Don Ricardo sólo padecía de ciertos achaques propios de su edad. No se cuestionó ni hay evidencia que tachara su habilidad y capacidad mental. De hecho, después de la venta continuó limitadamente administrando la finca para fines de su liquidación. Sobre el alegado favoritismo hacia la hija, el foro primario correctamente resolvió que dicha prueba, aunque evidenciaba un afecto particular, era de

índole especulativa, conjetural y escaso valor probatorio para llegar a la conclusión pretendida. Por último, y con relación al rechazo experimentado por el demandante de parte de la viuda e hija, concluyó que aunque ello era cierto, ese hecho no era suficiente para inferir que la transacción se hizo dolosamente para perjudicarlo.

El examen ponderado de la prueba nos lleva a compartir las apreciaciones del tribunal de instancia. Recuérdese que Don Ricardo no sólo reconoció como hijo al demandante, sino que siempre lo trató como tal y le brindó cariño. No perteneciendo al núcleo familiar original, era explicable que no pudiera dispensarle y prodigarle todas o las mismas atenciones que a sus restantes hijos. Si partimos de la premisa que el negocio jurídico fue realizado sin padecer de sus facultades mentales, no podemos inferir ni atribuirle al causante propósitos ruines a lo que siempre fue un curso de acción noble y correcto en cuanto a su trato para con el demandante. Lo que más bien aflora de los señalamientos expuestos son las limitaciones inherentes que surgen en este tipo de circunstancias por innumerables factores entre los cuales figuran prominentemente razones de tipo familiar, conyugal, emocional y social. El ideal constitucional compartido por nosotros de igualdad entre los seres —debido a las complejidades de la naturaleza humana (virtudes y prejuicios)— lamentablemente no significa ni garantiza la paridad de sentimientos por parte de todos los protagonistas de este drama.

En este primer planteamiento de error se enfatiza que al fallecer el causante no dejó dinero alguno en efectivo. A tales efectos, se señala que aun cuando él había tomado ciertos préstamos —$200,000 al Federal Land Bank en 31 de mayo de *1966* y $100,000 en 27 de febrero de *1967* al Product Credit Association—, tenía ingresos mensuales de alrededor de $3,850, provenientes de distintas fuentes y había recibido alrededor de $50,000 en la compraventa impugnada, sólo poseía $600 en cuentas de bancos y

ningún dinero en efectivo al fallecer en el 1974. Sobre el particular advertimos que los préstamos sustanciales aludidos fueron realizados varios años antes de la muerte del causante. No es razonable, por tanto, derivar las conclusiones reclamadas. De otro lado, la prueba demostró que éste endosó y depositó en su cuenta bancaria los cheques correspondientes al pronto pago ($50,000) más los intereses pagados de la venta de la finca. También fueron admitidos los cheques en pago de los intereses adeudados al Federal Land Bank y la hipoteca con la Production Credit Association. Se probó, además, que el causante tenía sus valores en una caja fuerte en su oficina en la farmacia de su propiedad. Dicha caja fue *robada* mientras él yacía en estado de gravedad. No se demostró que mantuviera una caja fuerte en su residencia u otro lugar donde pudiera tener guardado dinero. Es obvio que Don Ricardo, como hombre profesional de éxito en los negocios, estaba acostumbrado a manejar y disponer con facilidad de dinero en efectivo, y realizaba negocios comerciales sin que, inclusive su esposa, tuviera conocimiento alguno de lo que acontecía con su capital financiero. Estas circunstancias sostienen ampliamente las determinaciones del ilustrado tribunal sentenciador.

Por último, el demandante alega que su causante pagaba las deudas y contribuciones de la finca en controversia y que la continuó administrando luego de la venta. La proposición no es del todo correcta. La prueba no demostró que el causante continuara pagando las contribuciones. Y sobre la administración de la finca surge que la misma fue de carácter limitado, *solamente* con el propósito de liquidar la lechería y vender el ganado. Por estas gestiones rindió cuentas mensuales a Nevárez.

Es a la luz de un enfoque integral de la evidencia que el tribunal a quo consideró improcedente la contención del demandante sobre la naturaleza y nulidad de la transacción envuelta, y resolvió que había sido *bona fide* sin

mediar intención de defraudarlo. En su perspectiva global, hemos de respetar tal determinación.

Igual conclusión procede respecto al señalamiento de los codemandados recurrentes de que constituyó un error la determinación de que Don Ricardo tuvo la intención de hacer una donación a su hija y yerno, de forma subyacente, a base de la relación familiar y los vínculos de negocio existentes entre ellos.

Es incuestionable que desde que los codemandados Héctor Nevárez y Carmen La Costa se casaron en 1947 fueron a vivir a la casa de Don Ricardo. Allí han vivido y criado su propia familia. Como correctamente precisó la sala de instancia y expusimos anteriormente, el hecho de convivir juntos propició que se creara una relación familiar especial y un sólo núcleo familiar constituido por los esposos La Costa-Bolívar y Nevárez-La Costa. Además, existía una relación de negocios. El causante era accionista de la Suiza Dairy, Inc. y su yerno accionista principal. Don Ricardo operaba una vaquería en la finca en controversia y la leche producida la vendía a la Suiza Dairy. El causante era el accionista principal de una farmacia en la cual su hija también era accionista. Esas circunstancias son las que movió al foro sentenciador a concluir que la venta se realizó por debajo del valor real en el mercado con la intención de favorecer a su hija Carmen.

Tampoco encontramos en el récord razones de peso por las cuales debamos alterar dichas determinaciones fácticas. No están presentes circunstancias extraordinarias, error manifiesto en la apreciación de la prueba, indicios de pasión, prejuicio o parcialidad —*Ortiz* v. *Cruz Pabón*, 103 D.P.R. 939, 946-947 (1975); *Morán Simó* v. *Gracia Cristóbal*, 106 D.P.R. 155, 161 (1977)— que nos mueva a descartarlas. Esta autorrestricción y deferencia se impone de manera especial en el caso de autos en que la observación y manera de declarar los testigos es de crucial importancia para detectar intenciones y móviles de ale-

gado engaño e inferir de la misma la verdadera naturaleza de la transacción.

## II

Como segundo error el demandante cuestiona la conclusión de que la compraventa fue válida, no obstante haber determinado que incluía una donación subyacente. Estos señalamientos envuelven una cuestión no resuelta en nuestra jurisdicción.

A los fines de su mejor entendimiento, es menester precisar el carácter del negocio envuelto: una compraventa *bona fide* que incluye una donación subyacente. O sea, que siendo el precio uno menor que el justo valor en el mercado de la finca vendida, ello implica que esa diferencia constituye una donación si la misma es hecha de buena fe y sin intenciones de defraudar a herederos legítimos. En tal eventualidad existiría causa en ambos contratos: en la "compraventa" *el precio pagado* y en la "donación" *la mera liberalidad del donante*. Bajo esa premisa —que oportunamente rubricaremos— no es correcto afirmar que estamos ante un contrato simulado —inválido por carecer de causa— sino ante un contrato disimulado de donación dentro del de compraventa. Nuestra jurisprudencia reconoce la validez de dicho contrato disimulado de donación si cumple los requisitos exigidos en las disposiciones del Código Civil referentes a las donaciones. *Hernández Usera* v. *Srio. de Hacienda*, supra. Aclarados estos extremos, advertimos la dificultad y diferencia que entraña el caso de autos con el de *Hernández Usera*, supra. Allí los contratos envueltos eran disimulados de compraventa en su *totalidad* para encubrir unas donaciones. Nunca medió causa para los contratos de compraventa. Aquí estamos ante un *acto mixto* en el que hay una compraventa real que surge del contrato suscrito entre las partes y, además, una donación disimulada sumergida en el mismo convenio,

resultante de una valoración judicial que excede el precio libremente acordado por los contratantes.

Esta disimilitud nos obliga a plantearnos las siguientes interrogantes: ¿Qué disposiciones del Código Civil hemos de utilizar para determinar si dicho acto es válido? ¿Aplicarán las normas referentes a los contratos *onerosos*, las relacionadas con la *donación*, o ambas? La determinación exacta es fundamental por las variadas consecuencias que una u otra pueden producir no sólo entre las partes, sino frente a terceros.(5) También la distinción es pertinente en lo concerniente a las leyes contributivas.

La solución de estas interrogantes nos lleva en primer lugar a concretar cuál es la naturaleza del acto mixto en cuestión. El tratamiento del problema en España y otras jurisdicciones es relevante y de gran ayuda. Veamos. El nombre común con que se conoce el tipo de contrato envuelto en el caso de autos es *"compraventa amistosa"*. El concepto acuña la relación dimanante cuando por ciertas consideraciones —a veces intangibles— una persona le vende a otra una cosa, pero mediando un precio menor al justo valor en el mercado. Clarificamos, no obstante, que el concepto no debe confundirse con otras situaciones que puedan presentar algunos perfiles afines, pero distintas por estar ausente el *animus donandi*, los cuales rebasan nuestro análisis decisorio.

> Cuando la moderación del precio obedezca *a motivos distintos de la liberalidad,* como en el caso de descuento ofrecido por un comerciante para atraerse a la clientela, o en el de que se haga la rebaja en el precio de un objeto con la finalidad de favorecer la venta de otro cuando ambos deban venderse conjuntamente; tampoco cuando se reduce el precio a partir de una determinada unidad de objetos comprados,

---

(5) A manera de ejemplo, la disponibilidad total de la acción de saneamiento en la compraventa, frente a la que se da sobre bienes donados; el carácter absoluto e irrevocable que de ordinario acompaña una compraventa, en contraste con la donación en que existe la revocación por ingratitud; y algunos requisitos de forma que pueden aplicar de manera distinta a estas figuras jurídicas.

hipótesis en la que lo que en realidad habría sería una determinación del precio en función de la cantidad de objetos vendidos, etc. (Énfasis nuestro.) Ferrandis Vilella, *Comentarios al Tratado de Derecho Civil de Enneccerus*, 3ra ed., T. II, Vol. 2, pág. 226.

■ Todas las fuentes consultadas[6] coinciden en clasificar el negocio jurídico que nos ocupa como una donación mixta (*negotium mixtum cum donatione*), cuya característica principal es contener un negocio oneroso y una liberalidad a la *misma vez*. Esta clase de donación, la mixta, cae dentro de las donaciones onerosas.[7]

Existen tres teorías sobre cuál es el régimen jurídico por el que han de regirse las donaciones onerosas.

La primera, llamada de la *unidad*, o como la denomina Castán[8] de *negocio único de donación auténtica*, propugna que al acto mixto se le apliquen solamente las reglas de la donación. Dentro de esta dirección existe el razonamiento de Manresa en el sentido de que los criterios a regir deben ser los de los contratos.[9]

■ Sin restar méritos a esta posición, notamos que la misma tiende a relegar a segundo plano un elemento esencial en la relación existente. Al considerar un contrato que contiene elementos de liberalidad y onerosidad solamente

[6] Albaladejo, *Curso de Derecho Civil Español, Común y Foral*, 1977, T. II, págs. 358–359; Puig Brutau, *Fundamentos de Derecho Civil*, 1956, T. II, Vol. II, pág. 116; Puig Peña, *Tratado de Derecho Civil Español*, 1944, T. IV, Vol. II, pág. 177; Sentencia del Tribunal Supremo de España del 19 de octubre de 1959; Scaevola, *Comentarios al Código Civil*, 1943, T. XI, Vol. II, pág. 594; Castán, *Derecho Civil Español, Común y Foral*, 10ma ed., T. IV, págs. 262–263; Ferrandis Vilella, *op. cit.*, pág. 226.

[7] Conforme el Art. 560, las donaciones entre vivos pueden ser de tres clases:

"1. La donación puramente graciosa o la que se hace sin condición y por mera liberalidad.

"2. La donación onerosa, o aquella en que se impone al donatario un gravamen sobre el valor de lo donado.

"3. La donación remuneratoria, o la que se hace a una persona por sus méritos o por los servicios prestados al donante, siempre que no constituyan deudas exigibles." 31 L.P.R.A. sec. 1983.

[8] Castán, *supra*, pág. 260.

[9] Manresa, *Comentarios al Código Civil Español*, 1972, T. V, pág. 140.

bajo la óptica de uno u otro, ciertamente estamos yendo en parte contra la voluntad de los contratantes. Tal enfoque iría en detrimento del principio consagrado en el Código Civil —Arts. 1233-1234— desde hace tiempo plasmado en nuestra jurisprudencia de interpretar un contrato atendiendo principal y especialmente la voluntad de los contratantes. *Acevedo* v. *Sucesión Caballero*, 9 D.P.R. 424 (1905). Por esta razón no nos inclinamos a adoptar una postura absoluta cuyo efecto real sea el que un convenio que contiene una clara intención de liberalidad y de onerosidad se rija *exclusivamente* por las disposiciones de las donaciones o de los contratos.

La segunda doctrina es conocida como la teoría de la *desarticulación*. Ésta se aparta de la anterior al proponer que se divida el negocio en dos: oneroso y gratuito. Sugiere se apliquen las disposiciones de los contratos en cuanto al gravamen —precio pagado por los donatarios— y las normas de las donaciones en cuanto al sobrante —dación subyacente.

El efecto[10] práctico y gráfico de esta teoría, así concebida, sería eliminar del texto del Art. 564 la referencia a las "donaciones remuneratorias", y como consecuencia tendería a leer así: "Las donaciones con causa onerosa se regirán por las reglas de los contratos, y . . . por las disposiciones de la presente parte en la parte que excedan del valor del gravamen impuesto." Sin embargo, advertimos que el resultado o efecto aparentemente producido es más bien equiparar el tratamiento de las onerosas con las remuneratorias. Esta posición toma como fundamento que el propio Código, al definir la donación onerosa en sus Arts. 560[11] y 561,[12] se refiere a ésta como aquella en

---

[10] La misma es sustentada por Scaevola, *Código Civil*, 1943, T. XI, Vol. II, pág. 594, e Isábal, *Donación Onerosa*, Enciclopedia Jurídica Española, 1910, T. XII, pág. 638.

[11] Véase escolio 7.

[12] Reza:

"En la donación onerosa, el gravamen impuesto al donatario debe ser inferior al valor de lo donado." 31 L.P.R.A. sec. 1984.

que hay un *gravamen impuesto* al donatario, en contraste a la remuneratoria, que se hace por liberalidad (méritos o servicios prestados al donante) sin que exista una deuda exigible. Sostienen que si el concepto "gravamen" del referido Art. 564 incluye los servicios de las remuneratorias su significado debe también englobar el gravamen en su acepción común, tal como sería el pago de cierta cantidad de dinero. Aducen, además, que los méritos o servicios prestados por el donatario al donante usualmente son consideraciones que no son susceptibles de fácil valoración —como sería una carga en la donación onerosa. Ello haría más difícil —en las remuneratorias que en las onerosas— determinar qué es lo realmente donado. ([13])

Aunque coincidimos con la lógica estricta de ese razonamiento, la dificultad práctica que plantea esta teoría nos lleva a descartarla. No es posible aplicarla en todas las situaciones en que convergen estos dos contratos. En aquellos casos en que las partes contratantes hayan acordado cuál objeto es donado su utilidad es manifiesta. Pero, por vía de ilustración, cuando la venta consiste de varias cosas y no puede precisarse del contrato ni de la prueba lo vendido y lo donado, no es viable por tanto determinar a qué parte del convenio hemos de aplicar las disposiciones del contrato y las de la donación.

La última teoría, más bien de carácter *ecléctico*, ha sido esbozada por Castán:

> Creemos, en definitiva, que el régimen de la donación con carga puede ser perfilado así:
>
> *a*) Son aplicables a dicha donación las reglas especiales que dedica a la misma nuestro Código civil, y que veremos después en orden a la capacidad para aceptarla, forma del acto, obligación de saneamiento y revocación por incumplimiento.

---

([13]) Esta posición ha sido adoptada en Méjico. El Art. 2337 del Código Civil mejicano dispone que: "[c]uando la donación sea onerosa, sólo se considera donado el exceso que hubiere en el precio de la cosa, deducidas de él las cargas."

*b*) En lo demás, siempre que sea posible la diferenciación y valoración de la parte onerosa y la parte liberal de la donación modal, se aplicará el desdoblamiento a que parece responder la redacción del artículo 622 [564], en su relación con el 619 [561], y que también resulta exteriorizado por el artículo 638 [580].

*c*) Cuando ese desdoblamiento no sea prácticamente posible, se aplicará a la donación onerosa el régimen unitario de la donación pura, según se desprende de los preceptos del artículo 619 [561] (que considera donación a la donación con carga) y 621 [563] (que establece el régimen general de normas por las que han de regirse las donaciones *ínter vivos*). *Derecho Civil Español, Común y Foral*, 10ma ed., T. IV, pág. 260. (14)

En resumen, esta teoría plantea que en aquellos casos de donaciones onerosas en que pueda diferenciarse la parte onerosa de la gratuita se aplique la segunda teoría, la de la desarticulación. Por ende, se utilizan las disposiciones de los contratos para el acto oneroso y las de la donación para la gratuita. De no ser susceptible de desdoblarse el acto, aplica la teoría de la unidad y, en consecuencia, se rige por las reglas de los contratos.

Según el propio Castán, esta posición parece que ha sido adoptada por la doctrina francesa. Al respecto, citando a Margarita Bouyssou, nos señala que:

El acto constituye, en su conjunto, una liberalidad: se le aplicarán, pues, en principio, las reglas de forma y fondo que se aplican a los actos gratuitos, como si se tratara de una liberalidad pura y simple, ya que si se tuviera en cuenta la carga habría que admitir la división del acto en dos partes, resultando contrario a la voluntad del disponente. Sin embargo, no se puede siempre ignorar la existencia del elemento oneroso que disminuye la liberalidad. Así, cada vez que haya oportunidad de proceder a una valoración precisa del emolumento transmitido al gratificado, se deberá deducir

---

(14) Ferrandis Vilella, en *Comentarios al Tratado de Derecho Civil en Ennecce-rus, supra*, también sostiene que se debe aplicar prudencialmente la teoría unitaria y la de la desarticulación que concuerda con lo expuesto por Castán Tobeñas. Págs. 227–228.

del montante de la liberalidad el valor de la carga impuesta. Haciéndolo así, no se escindirá la disposición en dos actos, uno gratuito y otro oneroso: se respetará fielmente la voluntad de las partes, que han decidido que el beneficiario reciba el importe de la liberalidad disminuido con el valor de la carga. Castán, *supra*, pág. 259.

■ Al reflexionar sobre estas teorías, nos inclinamos a favorecer la posición ecléctica sostenida por Castán. Al combinar la teoría de la unidad y la de la desarticulación en *una* se sobrepasan las objeciones técnicas y obstáculos prácticos que surgen en el uso individual de cada una. Es la solución más práctica a los problemas que puedan surgir bajo esta figura jurídica. Además, se respeta en lo posible la intención de los contratantes. Creemos que es la más correcta y justa en nuestro medio ambiente jurídico. Se impone que la apliquemos al caso de autos.

### III

Siguiendo la metodología analítica recomendada por Castán, hemos de examinar si en la transacción se cumplió con los requisitos de forma de las donaciones.

A. *Requisitos de Forma:*

■ Según nos pronunciamos en *Hernández Usera*, supra, para que una donación disimulada sea válida deben concurrir los siguientes requisitos: (1) que el contrato simulado que la encubre se haya otorgado mediante escritura pública; (2) que se describan individualmente los bienes donados, y en caso de donación onerosa, que se expresen las cargas que el donatario asume y (3) que se haga constar la aceptación del donatario en la misma o en una escritura separada, pudiendo deducirse tal aceptación de la firma del documento simulado.

Todos estos requisitos se cumplieron en el caso ante nos. Así, el contrato de compraventa fue suscrito por ambas partes en escritura pública, se incluyó la cantidad a ser pagada (carga) por los compradores-donatarios y los bienes

y su medida fueron individualmente descritos, tanto en la escritura original como en el acta aclaratoria posterior.

B. *Régimen Jurídico Aplicable:*

Para detectar el régimen jurídico aplicable al contrato mixto que nos ocupa, procede determinar si es posible o no la diferenciación y valoración de la parte onerosa y parte liberal.

Según expusimos, la sala de instancia determinó que la compraventa se efectuó por el precio estipulado en el contrato, a saber, $604,000. La donación, a su vez, la calculó en la cantidad de $309,670 a base de que los terrenos, por cuerdas, fueron valorados en un precio menor. El conocimiento de las cantidades que responden a la compraventa y a la donación nos permite diferenciar la parte gratuita de la onerosa. En consecuencia, es de aplicación el criterio del desdoblamiento del acto mixto y podemos examinar la validez de los dos contratos a base de las disposiciones correspondientes del Código Civil aplicables a cada uno.

A tales efectos, con relación a la donación, resolvemos que su causa es válida. Según criterio del tribunal de instancia, compartido por este foro, la misma *no* fue hecha con intención de defraudar a los demás herederos. Constituyendo la mera liberalidad causa suficiente, ésta es válida. Art. 1226 del Código Civil, 31 L.P.R.A. sec. 3431. La donación consistió de 172.04 cuerdas, que valoradas en $1,800 cada una ascendió a $309,670.

Respecto a la compraventa, el demandante alega que no hay objeto cierto, según los Arts. 1225 y 1334 del Código Civil.([15]) Se ampara en que no se especificó en el contrato

----

([15]) El Art. 1225 reza:

"El objeto de todo contrato debe ser una cosa determinada en cuanto a su especie. La indeterminación en la cantidad no será obstáculo para la existencia del contrato, siempre que sea posible determinarla sin necesidad de nuevo convenio entre los contratantes."

Y el Art. 1334 lee:

"Por el contrato de compra y venta uno de los contratantes se obliga a entregar una cosa determinada y el otro a pagar por ella un precio cierto, en dinero o signo que lo represente."

qué parte de la finca o del ganado fue vendida y cuál fue donada. O sea, sostiene que la indeterminación de cantidad invalida el contrato. Notamos que esta alegación se circunscribe a si el contrato cumple con el Art. 1225 en el sentido de que: "La indeterminación en la cantidad no será obstáculo para la existencia del contrato, siempre que *sea posible determinarla* sin necesidad de nuevo convenio entre los contratantes." (Énfasis suplido.) No creemos que tenga razón.

El comentarista Luzzatto en su obra *La Compraventa* —traducción y notas de Bonet Ramón, págs. 54–55 (1953)— resume el enfoque doctrinal:

> . . . la expresión determinable puede ser entendida en varios sentidos: en el sentido de que los contrayentes mismos hayan establecido un medio para determinar el objeto . . . puede ser determinable en el sentido de que por otras cláusulas del contrato, o *por circunstancias inequívocas que preceden o acompañan a su formación*, pueda, de modo indirecto sacarse la determinación del objeto. . . .

> Ante todo, respecto de la determinación de la cosa vendida, vale el principio comúnmente enseñado en materia de obligaciones, según el cual *no es necesario que la determinación sea absoluta; así la cosa vendida puede ser determinada sólo en el género*, y el género puede ser determinado con una cierta amplitud, siempre que ésta no sea tal que haga vano e irrisorio el vínculo jurídico, como sucedería si se vendiese un animal en general. (Énfasis suplido.)

Añade además:

> . . . *si hay elementos en virtud de los cuales pueda determinarse, al menos con una cierta aproximación, la cantidad de la cosa vendida, la venta deberá considerarse válida. . . .*

> *Un elemento importante también aquí podrá ser el precio que eventualmente haya sido establecido por los contrayentes,* precio que *combinado con singulares unidades* de peso, de medida, etc., *del género vendido, puede dar, al menos aproximadamente, la indicación de la cantidad.* (Énfasis suplido.)

■ Del contenido del contrato impugnado junto con el acta aclaratoria otorgada posteriormente surgen suficientes

elementos de juicio valorativos para que haya la determinabilidad de la cantidad exigida por el Código Civil. A tal efecto se consignó, con precisión, el número total de cuerdas, y mediante el acta aclaratoria se desglosó la tasación dada por los otorgantes a cada una de las cosas vendidas. Estos elementos son suficientes para que pueda determinarse el objeto vendido. Como bien dice Luzzatto, no tiene que ser una determinación absoluta y exacta, es suficiente con que se pueda establecer aproximadamente su cantidad. No hay impedimento teórico ni práctico para que consideremos la donación efectuada imputable y determinable a base del número necesario de cuerdas del inmueble, a saber, 172.04.[16] Concluimos que fue válida la compraventa.

## IV

Réstanos considerar los otros señalamientos de error.[17]

Los demandados como tercer apuntamiento cuestionan la valoración judicial de la finca a razón de $1,800 por cuerda, alegando que el juzgador descartó el estado financiero, el testimonio de dos agricultores y la opinión de su perito tasador. No tienen razón.

Como indicamos previamente, el tribunal ponderó y depuró factores tales como otras ventas más contemporáneas, cabida, conformación de los terrenos, carácter agrícola del área, su inundabilidad, facilidades de servicios de agua, luz, teléfono y otros, grado de desarrollo de sus pueblos adyacentes, clasificación de zonificación por la Junta de Planificación, mejoras, edificaciones, y potencial de uso

---

[16] Tres fundamentos nos mueven a descartar como comprendidos en la donación el ganado vacuno y las herramientas, valorados respectivamente en $59,040 y $7,827.50: (1) únicamente el valor del bien inmueble fue considerado por el tribunal sentenciador como inferior a su "justo valor"; (2) no hubo prueba de que el ganado vacuno y las herramientas fueran valorados de manera inferior; y (3) la administración limitada del causante, con posterioridad a la venta, dirigida a liquidar la lechería y el ganado vacuno —por cuyas gestiones rindió cuentas a Nevárez— forzosamente excluyen tales objetos de la donación.

[17] El demandante renunció al señalamiento de que la finca era privativa en su totalidad.

residencial, comunal e industrial para llegar a su conclusión. La contención de los demandados pone énfasis en algunos de estos factores, pero descarta o minimiza otros, lo cual en resumidas cuentas adolece de la falla de no ser una evaluación integral y confiable.

También los demandados señalan que el tribunal de instancia erró al negarse a: (1) resolver que no era inoficiosa la donación; (2) desestimar la demanda en contra de los demandados Héctor Nevárez y Hacienda San Martín, Inc.; y (3) imponer honorarios de abogado al demandante. No tienen razón.

Primeramente, alegan erróneamente que la determinación sobre la inoficiosidad corresponde al tribunal y no al contador-partidor. El Código Civil en su Art. 1012 ordena que:

> Cuando los herederos mayores de edad no se entendieren sobre el modo de hacer la partición, quedará a salvo su derecho para que lo ejerciten en la forma prevenida en los preceptos sobre procedimientos legales especiales.([18]) 31 L.P.R.A. sec. 2878.

■ En virtud de este precepto el demandante solicitó en su demanda que el tribunal nombrara un administrador judicial y ordenara la partición de la herencia. El procedimiento sobre administración se lleva a cabo en el caso Civil Núm. 74-6996 ante el Tribunal Superior, Sala de San Juan. Así las cosas, existiendo una controversia sobre la inoficiosidad de la donación, el tribunal cumplió con el mandato de la ley al resolver que fuera el contador-partidor —una vez nombrado— el que primeramente hiciera tal determinación. Éste, como parte de las funciones que le asigna la ley, tendría que decidir si fue inoficiosa o no la donación *a base del inventario y avalúo de los*

---

([18]) Dichos procedimientos contenidos en la Ley de 9 de marzo de 1905, fueron incorporados en los Arts. 600 a 605 del Código de Enjuiciamiento Civil, 31 L.P.R.A. secs. 2621 a 2626, vigentes hoy en virtud de la Regla 72 de Procedimiento Civil de 1979. *Cf. Ab Intestato Balzac Vélez*, 109 D.P.R. 670 (1980).

*bienes hereditarios que oportunamente realice.* Ello es una función inherente al contador-partidor. 32 L.P.R.A. sec. 2624. El señalamiento es prematuro. *Cf. Ab Intestato Marini Pabón,* 107 D.P.R. 433, 438 (1978). No es ésta la etapa propicia de los procedimientos para que se intervenga con dicha determinación. El valor de los bienes relictos continúa parcialmente en controversia. Si alguno de los herederos no está conforme con el cuaderno particional del comisario, en su momento propicio podrá presentar sus objeciones al tribunal según dispone la ley. 32 L.P.R.A. sec. 2624.

Corolario de lo expuesto, hasta que se concluya la inoficiosidad o no de la donación, los codemandados Héctor Nevárez y Hacienda San Martín, Inc. deben permanecer en el pleito. La conclusión de que la corporación Hacienda San Martín, Inc. es de carácter íntimo-familiar controlada y álter ego de Nevárez —ampliamente sostenida por la prueba— así lo exige.

 En cuanto a los honorarios de abogado, el error fue cometido pero a la inversa. Opinamos que la sala sentenciadora debió mantener los $10,000 de honorarios de abogado impuestos originalmente a los demandados en favor del demandante. El pleito tuvo que ventilarse ante la negativa de los demandados de reconocer la donación subyacente. Aun en esta etapa apelativa se niegan a admitirla.

*Debe modificarse únicamente en este extremo la sentencia.*

Los Jueces Asociados Señores Dávila, Martín e Irizarry Yunqué no intervinieron.