Sara Guzmán Rodríguez, demandante y apelante, *v.* Celia Guzmán Rodríguez, demandada y apelada; Herminia Rodríguez Vda. de Guzmán, interventora y apelada.

Número 11223.

*Sometido:* 7 de julio de 1954. *Resuelto:* 16 de septiembre de 1955.

*José Sabater,* abogado de la apelante; *Mario Báez y García,* abogado de la apelada; *Eudaldo Báez García,* abogado de la interventora.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

La conclusión fundamental de la ilustrada Sala sentenciadora es que cierta venta, hecha por doña Herminia Rodríguez viuda de Guzmán a sus dos hijas doña Sara y doña Celia Guzmán Rodríguez, fué una venta simulada. Doña Sara alegó y trató de probar que no era una venta simulada y doña Celia aceptó y consiguió convencer a la ilustrada Sala sentenciadora que era una venta simulada. En la transcripción de evidencia hay suficiente prueba para sostener la conclusión de la ilustrada Sala sentenciadora.

Los hechos jurídicos que debemos considerar a los efectos de confirmar la sentencia son los siguientes: el día 12 de julio de 1941, doña Herminia Rodríguez viuda de Guzmán compareció ante el notario don Andrés Ruiz, hijo, de Mayagüez, para venderle determinada casa a sus dos hijas doña Sara Guzmán Rodríguez, ahora demandante y apelante y doña Celia Guzmán Rodríguez, ahora demandada y apelada, por partes iguales entre ellas, por el precio de $3,500, que declaró recibidos antes del otorgamiento de la escritura. En dicha escritura no comparecieron las adquirentes a aceptar la venta, pero compareció a nombre de ellas, un mandatario verbal a aceptarla. Las posibles compradoras no entraron en

posesión de la finca, ni hicieron actos de dominio algunos, y por el contrario, la demandante y apelante, actuando como apoderada de la madre vendedora, hizo a nombre de ésta las siguientes actuaciones: (a) inscribió dicha casa a nombre de la madre y como propiedad de ésta en la Oficina de Inquilinato; (b) cobró los alquileres de dicha casa a nombre de la madre vendedora entregando a ésta los cánones cobrados a los inquilinos; (c) incluyó las rentas de dicha casa a nombre de la madre vendedora en las declaraciones sobre ingresos que rindió como su mandataria.

La madre vendedora perdió sus facultades mentales y el día 14 de marzo de 1952 fué declarada incapaz por resolución del anterior Tribunal de Distrito de Puerto Rico, Sección de San Juan. Después de haber sido su madre declarada incapaz, y cerca de once años más tarde del otorgamiento de la escritura de compraventa, la demandante y apelante doña Sara Guzmán Rodríguez compareció el 15 de mayo de 1952 ante el notario de Mayagüez don Andrés Ruiz, hijo, y ratificó la escritura de compraventa que a su nombre había aceptado el mandatario verbal. La otra hermana compradora, no sólo no ratificó la escritura de compraventa, sino que se opuso a la pretendida división de comunidad solicitada por el presente recurso, declarando y recibiendo crédito por ello de la ilustrada Sala sentenciadora, que ni ella ni su hermana satisficieron a su madre la suma, que como precio de la venta, se hizo figurar en la escritura de compraventa.

La ilustrada Sala sentenciadora concluyó como cuestión de derecho que (1) la venta o traspaso de la casa por ser simulada era nula e inexistente por no haber mediado causa o consideración para dicha venta o traspaso, de acuerdo con los arts. 1213 inciso 3 y 1227 del Código Civil de Puerto Rico; (2) la venta no podía ser considerada como una donación y (3) la excepción de nulidad no estaba prescrita.

En efecto, el art. 1213 inciso 3 del Código Civil de Puerto Rico dispone que no hay contrato cuando no media causa en la obligación que se establezca y el art. 1227 dispone

que los contratos sin causa no producen efecto alguno. Castán, al tratar de la nulidad absoluta o radical de los contratos señala: "Puede considerarse en nuestro Derecho inexistente o radicalmente nulo el contrato en los siguientes casos: (*A*) cuando *le falta de hecho alguno de los elementos esenciales a su formación* (hipótesis del art. 1261) [1213 nuestro], o sea: *a'*) cuando hay defecto absoluto de consentimiento, como en el caso del acto que se ha llamado vacío o supuesto (con simulación absoluta) o el de que no llegara a formarse dicho consentimiento por faltar la conformidad entre la oferta y la aceptación; *b'*) defecto de concurrencia de dos o más voluntades distintas y autónomas (Sentencia de 6 de marzo de 1909 (España) dictada a propósito de un contrato celebrado por un padre con sus hijos menores); *c'*) defecto de objeto; *d'*) *ausencia o ilicitud de la causa,* (art. 1275) [1227 nuestro]; *e'*) inobservancia de las formalidades prescritas con carácter de requisito esencial (como en la hipoteca o la *donación de bienes inmuebles sin escritura pública*); (*B*) cuando el contrato se ha celebrado en violación de una prescripción o prohibición legal fundada sobre motivos de orden público (hipótesis del art. 4 del Código) [ 4 nuestro]; así sucede en los pactos sobre sucesión futura (art. 1271), [1223 nuestro], sociedades universales entre cónyuges, transacciones sobre el estado civil, convenciones usurarias de la Ley de 23 de julio de 1908, etcétera . . . en términos propios, cabe decir que el contrato inexistente o nulo con nulidad absoluta no produce efecto jurídico alguno como tal. Su característica es precisamente la carencia de efectos específicos. *Quod nullum est nullum producit effectum.* El derecho considera a dicho contrato como no realizado": 3 Castán–Derecho Civil Español, Común y Foral, 437–438, (octava ed. del Instituto Editorial Reus de 1954). (Corchetes nuestros.)

■■ La simulación puede ser absoluta o relativa y se refiere al consentimiento. Puig Peña la sitúa en la divergencia consciente del consentimiento: *"la simulación,* en la que las partes, de acuerdo, quieren cosa *distinta* de la que decla-

ran para producir, con fines de engaño, la apariencia de un negocio jurídico que no existe o es distinto de aquel que realmente quieren llevar a efecto. De esta definición se infieren los dos principales tipos de simulación: la *absoluta* en la que las partes no quieren celebrar ningún negocio y la *relativa* (*negocio disimulado*) en la que las partes encubren con su acto otro distinto, querido realmente por ellas (*se encubre, por ejemplo, con una venta, una donación*). La simulación *absoluta* produce la *inexistencia* del contrato (29 de enero de 1945) entre las partes . . . *En la simulación relativa vale entre las partes el negocio encubierto* anulándose el simulado (*plus valet quod agitur quiam simulare concipitur*), siempre que en [el] negocio simulado (aparente) *se contengan todos los elementos sustanciales que son necesarios para la existencia del disimulado* (encubierto)": 4 Puig Peña—Tratado de Derecho Civil Español 22, (ed. de la Editorial Revista de Derecho Privado del 1951). Si en el negocio simulado, (en el caso que nos ocupa, la compraventa) no se contienen todos los elementos necesarios para la existencia del negocio disimulado, (en el caso que nos ocupa, la donación), la situación jurídica que se produce es que resultan absolutamente nulos tanto la compraventa como la donación.

■ 2. En este caso la ilustrada Sala sentenciadora concluyó con aguda certeza que tampoco podría sostenerse el negocio intentado como una donación y su conclusión resulta enteramente correcta. Como cuestión de realidad jurídica, se trataría de una donación que no habría pasado de la policitación (ofrecimiento). Sabido es que la donación se perfecciona a través de tres actos jurídicos claros y precisos: (1) la policitación o el *ofrecimiento* de lo que se intenta donar al donatario, (2) la *aceptación* por el donatario de lo que se intenta donarle y (3) la notificación de dicha aceptación al donante.

■ En este caso hay una cuestión previa de capacidad, porque el mandatario verbal no puede aceptar donaciones y hay una cuestión posterior de perfeccionamiento porque al

donante incapacitado no se le puede notificar la aceptación de una donación por ratificación posterior del donatario. En cuanto al primer aspecto de la cuestión, si puede entenderse aceptada una donación por un mandatario verbal, que actúa a nombre del donatario, los comentaristas están contestes en que no se puede entender aceptada la donación, si se trata, como en este caso, de bienes inmuebles. Dice Scaevola: "¿Requiérese poder otorgado ante notario, lo mismo para la aceptación de una donación de bienes muebles que de cosas raíces? Respondemos: por lo que atañe a bienes inmuebles la escritura de apoderamiento es inexcusable; el poder forma parte del título escrito, y éste, según previene el art. 623 [575 nuestro] debe consistir en escritura pública, para que sea válida la donación": XI Scaevola 739, (quinta ed. del Instituto Editorial Reus de 1943). Dice Manresa: "El donatario debe aceptar por sí o por medio de persona autorizada con poder . . . . La donación no exige la presencia real del donatario en el acto; pero tampoco basta la aceptación de cualquiera si no presenta poder especial para aceptar la donación de que se trate, o poder general que comprenda la facultad de aceptar donaciones o toda disposición de bienes en favor del mandante. Como se trata de un acto que ha de perjudicar a tercero, como sería anómalo considerar autorizado a cualquiera que, o presentase una carta o manifestase que obraba por mandato verbal, para intervenir en el acto que reviste tal importancia para el legislador y como el art. 630 [572 nuestro] habla de poderes determinados y no de mandato en cualquier forma, hemos de deducir que el poder ha de constar en documento público. El gestor de negocios ajenos, *el mandatario verbal*, el que presenta poder general pero no bastante, etc., *al aceptar, realiza un acto nulo*. Puede después el donatario *ratificar* la aceptación. Esta ratificación valdrá, *pero valdrá desde su fecha como nueva y eficaz aceptación* hecha por el donatario": 5 Manresa–Comentarios al Código Civil Español 132 (Sexta ed. del Instituto Editorial Reus de 1951). Como se ve, aun descartando el contrato si-

mulado (la compraventa) y considerándolo como el contrato disimulado o encubierto (la donación), la aceptación que hizo el mandatario verbal en el otorgamiento de la compraventa no fué suficiente en derecho para que pudiéramos hoy considerar, como debidamente aceptada, la donación disimulada o encubierta.

■ Ahora bien, la ratificación que once años más tarde realiza la posible donataria, ¿curó el defecto de la indebida aceptación? Esto nos lleva al segundo aspecto de la cuestión en cuanto a la capacidad que necesita el donante para darse por notificado de la nueva aceptación que implica la ratificación. Sobre este aspecto de la cuestión dice Manresa: ¿En qué época debe tener capacidad el donante? Cuando el ofrecimiento y la aceptación de la donación sean simultáneas, no puede haber cuestión. Si la aceptación se hace algún tiempo después, opina Troplong, que también en ese momento ha de tener capacidad el donante, porque entonces es cuando existe el concurso de las dos voluntades, sin cuyo requisito no existe donación. Cuando la donación no se perfecciona en el mismo acto—dice Baudry Lacantinerie—hay que distinguir tres fases: 1ª—la policitación hecha por el donante; es decir, el ofrecimiento que hace al donatario; 2ª la aceptación de esta policitación por el donatario; 3ª la notificación de esta aceptación al donante. El donante debe tener la capacidad de derecho y la de hecho en el momento de la policitación, ya que es entonces cuando afirma su voluntad de donar. *Esta doble capacidad debe existir también en el momento de la notificación de la aceptación, pues es entonces cuando el contrato se perfecciona.* Pero no es necesario que subsista durante el tiempo intermedio entre la policitación y la notificación de la aceptación: *media tempora non nocent* . . . . Luego debe admitirse la necesidad de la capacidad del donante en las dos épocas citadas: la del ofrecimiento y la de la aceptación. Téngase presente que para el donante no existe la aceptación mientras no la conoce, y por tanto, que respecto a él, el momento de la aceptación es el de la notificación, como veremos,

al ocuparnos del artículo 629", [571 nuestro]: 5 Manresa 118–119 (sexta ed. del Instituto Editorial Reus de 1951).

Sobre este mismo aspecto de la cuestión dice Scaevola: "Más, y si el donante se incapacita, v. gr., cae en la locura o los Tribunales le declaran pródigo antes de la aceptación por el donatario, ¿surtirá efectos la donación? Porque si la muerte borra la persona natural, la declaración de incapacidad capitidisminuye la personalidad civil, y por razón de analogía parece justo sostener asimismo análogo principio. Y así es como, con efecto, se ha pronunciado el común sentir. Hay, es verdad, autores que mantienen un criterio contrario, verbigracia, Demante, en cambio forman en la mayoría Demolombe, Marcadé, Laurent, etc. ¿No sería absurdo admitir la posibilidad de que un contrato consensual se perfeccionase por un consentimiento prestado en un tiempo en que una de las partes estipulantes carecía de capacidad para contratar? Porque en los contratos consensuales el aliento vital deriva de la conjunción de las voluntades; y si bien por las condiciones especiales del contrato de donación, por no envolver más que una prestación, o lo que es lo mismo, por su unilateralidad, es factible romper esa continuidad instrumental intrínseca de los contratos bilaterales, no por esa nota singular de las transmisiones meramente gratuitas inter vivos se desnaturaliza el contrato. Para que el consentimiento se produzca es menester que las voluntades se comuniquen (a cuyo efecto tiene la notificación), y que por virtud de esta comunicación surja esa unidad fundamental de pensamiento; que es lo que constituye como el alma del contrato. Por esto, es parecer ordinariamente aceptado el de que el donador debe disfrutar de plena capacidad, no solamente en el acto del otorgamiento, sino asimismo en el de la aceptación por el donatario y en el de la notificación. Después de todo, no se trata de otra cosa que de un contrato cuyo proceso jurídico, en lugar de condensarse íntegro en la continuidad de un solo instrumento, se descompone en varios grados sucesivos; sumadas todas las cuotas dan el mismo resultado. Es una suma que se descompone en

sus sumandos. ¿Y por ventura esto altera la naturaleza del contrato? No; como la descomposición de las sumas tampoco modifica su condición aritmética ni altera su total." 11 Scaevola 728, (ed. citada).

Como se ve, la ratificación hecha por la demandante y apelante no fué suficiente en derecho para crear la notificación de la aceptación, y por tanto, la donación, como contrato disimulado o encubierto, resulta nula. Estamos conformes asimismo con la ilustrada Sala sentenciadora, que ni la adjudicación de bienes en pago de deudas existentes entre la madre y las hijas, ni la restitución de lo que la madre hubiera retenido de la herencia paterna de las hijas, hubieran podido prevalecer de acuerdo con los hechos declarados como hechos probados por la ilustrada Sala sentenciadora. No se trataba de deudas o reclamaciones líquidas y exigibles que hubieran podido substituir el valor figurativo del precio.

■ En apelación ante nos la demandante y apelante señala cuatro errores cometidos por la ilustrada Sala sentenciadora. El primer error referente a la prescripción de la excepción de nulidad, de acuerdo con el art. 1253 del Código Civil de Puerto Rico, interpuesta por la demandada y apelada no fué cometido. Como bien dice Castán "el contrato nulo, por ser considerado·cómo si no existiese, no puede ser objeto de confirmación ni de prescripción sanatoria", (pág. 439 de la obra citada). La prescripción del art. 1253 se refiere a los contratos anulables pero no nulos, "(a) en los casos de intimidación o violencia, desde el día en que éstas hubiesen cesado; (b) en los de error o dolo o falsedad de la causa, desde la consumación del contrato (porque como dice Manresa, el cumplimiento que ésta supone, permite apreciar en la realidad, la índole e importancia de cosas y obligaciones y ver la diferencia de lo real y lo convenido); (c) cuando la acción se dirija a invalidar contratos hechos por mujer casada, sin licencia o autorización competente desde el día de la disolución del matrimonio; (d) y cuando se refiera a los contratos celebrados por los menores o incapacitados, desde

que salieran de la tutela (artículo 1301)" [1253 nuestro]: Castán, obra citada, pág. 443.

El segundo error referente a que la conclusión de la ilustrada Sala sentenciadora en el sentido que no hubo consideración en la compraventa es errónea, fundamentalmente descansa en la apreciación de la prueba que tuvo ante sí la ilustrada Sala sentenciadora. No estando dicha conclusión desnuda de toda prueba, y por el contrario, estando sostenida por prueba tanto documental como testifical, no resulta errónea en el sentido en que así la considera la Regla 52(a) de las Reglas de Enjuiciamiento Civil de Puerto Rico.

El tercer error referente a que la ilustrada Sala sentenciadora cometió error al negarse a resolver que la interventora y sus hijas están *in pari delicto* y que el tribunal no puede alterar la situación en que se han colocado las partes, ya hemos visto que el contrato encubierto fué una donación que no llegó a perfeccionarse. Siendo ésta la situación ningún estado de derecho se produjo dentro de la cual pudiéramos considerar a las partes vinculadas por alguna implicación de causa torpe (ilicitud).

No existe tampoco ningún impedimento por parte de la demandada y apelada y aun de la interventora para interponer la excepción de nulidad, cuando se trata de un contrato nulo e inexistente, puesto que dicho contrato no produce efectos jurídicos de clase alguna entre las partes que pudieran resultar obligatorios para una u otra parte.

*Debe confirmarse la sentencia apelada.*