ELLIS J. GONZÁLEZ MUÑIZ y FÉLIX GONZÁLEZ MUÑIZ, *Ex parte,* demandantes y peticionario el último.

*Número:* CE-89-703 *Resuelto:* 21 de junio de 1991

566

*Iván Díaz de Aldrey*, abogado del peticionario; *Charles A. Cuprill Hernández*, abogado de Ellis J. González Muñiz; *José A. Morales*, abogado de Filihilda González Muñiz; *Baldramina González Muñiz* y *Solamina González Muñiz, pro se.*

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

Doña Aurelia Muñiz de González murió el 3 de marzo de 1984. Tres (3) meses después, el 4 de julio de 1984, falleció quien en vida fuera su esposo, Don Félix González Pérez. Ambos habían otorgado idénticos testamentos abiertos el 1ro de noviembre de 1977. Nombraron albacea a uno de sus hijos, Ellis J. González Muñiz, y le dispensaron de prestar fianza.

En sus inicios, Ellis J. desempeñó su cargo asesorado por un contable. En esa etapa se pagaron $546,349.85 en concepto de contribución del caudal relicto de doña Aurelia, a base de una herencia valorada en $4,158,867.18. El Departamento de Hacienda expidió el relevo correspondiente.

Veinticinco (25) días después se produjo la tasación y el relevo de *exactamente* los mismos bienes con relación al caudal relicto de don Félix. Se pagaron sólo $167,205.99.

En el Tribunal Superior, Sala de Ponce, ambas testamentarías fueron consolidadas y se autorizó al albacea Ellis J. a rendir conjuntamente las cuentas trimestrales de cada albaceazgo. De una de estas, la correspondiente al trimestre de 1ro de diciembre de 1984 a 28 de febrero de 1985, surgió que se expidieron veintiún (21) cheques pagaderos al portador (*cash*) por concepto de "adelantos a herederos" y una transacción bancaria de veinte mil dólares ($20,000), para un total de $256,199.06. Inconforme, su hermano Félix González Muñiz, como coheredero, impugnó esos desembolsos. Negó que hubiera recibido anticipo alguno de su herencia y expuso, además, que desconocía si los otros hermanos herederos lo habían recibido.

El 13 de mayo de 1986 el Departamento de Hacienda notificó una *deficiencia* de $437,868.47 correspondiente a la contribución sobre el caudal relicto de don Félix.

Así las cosas, mediante escrito presentado en corte abierta el 5 de agosto de 1986, Félix solicitó la destitución de Ellis J. como albacea y el nombramiento de un administrador judicial. El tribunal concedió cinco (5) días para que los demás herederos se manifestaran. El 11 de agosto de 1986 Ellis J., *sin dar explicación*, renunció.

Ante este cuadro, el tribunal nombró administrador judicial al Contador Público Autorizado (C.P.A.) Erasmo Rivera Lebrón. Tras la oposición de varios herederos, se dejó sin efecto dicho nombramiento y se designó al C.P.A. Luis Antonio Feliciano, quien también se desempeñaría como contador-partidor.

Para cubrir la deficiencia notificada y beneficiarse de la amnistía contributiva —Ley Núm. 6 de 9 de octubre de 1987— el nuevo administrador recomendó que se endeudara la sucesión, pues la venta de ciertos inmuebles no era factible antes de la fecha límite en que vencía la amnistía.

Félix se opuso. Alegó que la deficiencia en cuestión era responsabilidad del ex albacea Ellis J. y requirió del tribunal que le exigieran la restitución inmediata de los fondos de la sucesión antes aludidos. Ellis J. repuso sólo cien mil dólares ($100,000). Manifestó que no estaba en condiciones de devolver más. En la vista oral celebrada ante este Foro el 5 de noviembre de 1990, *su representación legal admitió que utilizó el dinero para uso personal.* (1)

---

(1) "HON. JUEZ REBOLLO:

"Pero, admisión de parte es relevo de prueba. *El admitió la substracción* de los $256,000.00 y pico de dólares.

"LIC. CUPRILL HERNANDEZ:

"El admitió la *utilización* de los $256,000.00.

"HON. JUEZ REBOLLO:

"Para asuntos no de la sucesión.

"LIC. CUPRILL HERNANDEZ:

"Eso no surge del récord del caso, Su Señoría.

"HON. JUEZ REBOLLO:

"¿Y qué admitió él entonces, en la opinión de usted?

Oportunamente, el foro de instancia (Hon. Delia Lugo Bougal, Juez) dictaminó que el ex albacea Ellis J. había *sustraído* $256,199.06 del caudal y que debía devolver el balance adeudado, con intereses al tipo legal, dentro del término de treinta (30) días. También ordenó la tasación de todas las *propiedades de la sucesión* y el pago de cuarenta mil dólares ($40,000) alegadamente adeudados a la heredera Filihilda González. Les pidió a las partes que se expresaran sobre la aplicabilidad del Art. 822 del Código Civil, 31 L.P.R.A. sec. 2519,(2) a la renuncia de Ellis J.

Tanto Félix como su hermano Ellis J. solicitaron la reconsideración. Félix pidió que se ampliara la tasación de las propiedades para incluir las fincas, rústicas y urbanas, donadas por sus padres a algunos de sus hijos. Fundamentó la necesidad de colacionar *todos* los bienes donados. Las partes también se manifestaron sobre la aplicabilidad del Art. 822 del Código Civil, *supra*, a la renuncia de Ellis J.

Con vista a estos escritos, el tribunal revocó la orden para la devolución inmediata del balance adeudado por Ellis J. y resolvió que dicha suma de dinero se ajustara en la adjudicación de los bienes. Denegó la solicitud de tasación de los bienes donados y se reiteró en que se pagaran cuarenta mil dólares ($40,000) a Filihilda González por razón de una promesa de donación de los causantes. Finalmente, se negó a aplicar las disposiciones del citado Art. 822 del Código Civil a la renuncia de Ellis J.

A solicitud de Félix, revisamos.

---

"LIC. CUPRILL HERNANDEZ:
 *"Haber utilizado $256,000.00.*
"HON. JUEZ REBOLLO:
 "¿Para uso personal?
"LIC. CUPRILL HERNANDEZ:
 *"Se puede inferir que para uso personal.*" (Énfasis suplido.) T.E. Vista Oral ante el Tribunal Supremo, pág. 22.
 (2) Dispone:
 "El albacea que no acepte el cargo o *lo renuncie sin justa causa,* perderá lo que le hubiese dejado el testador, salvo siempre el derecho que tuviere a la legítima." (Énfasis suplido.) 31 L.P.R.A. sec. 2519.

## II

La solución del recurso requiere un breve examen de la institución del albaceazgo. Como veremos, sus perfiles y el alcance de la teoría general de las obligaciones demarcan su responsabilidad.

■ Curiosamente el Código Civil no define al "albacea". Sin embargo, la doctrina está conteste en que es la persona designada por el causante para ejecutar su última voluntad. M. Albaladejo, *El albaceazgo en el derecho español*, Madrid, Ed. Tecnos, 1969, pág. 20. Comenta dicho autor que "[e]sa *misión que se encarga al albacea. . . demuestra que se basa en la confianza que en el que la recibe tiene el causante*, que, en efecto, suele designar albaceas a parientes o amigos especialmente fieles . . .". (Énfasis suplido.) Íd., pág. 24. Así, en palabras de Puig Ferriol, "el fundamento del albaceazgo está en la *fiducia*". (Énfasis suplido.) *El Albaceazgo*, Barcelona, Ed. Bosch, 1967, pág. 40.

■ En cuanto a sus facultades, el Código Civil intima que serán las expresamente conferidas por el testador, siempre que no sean contrarias a las leyes. Art. 823 del Código Civil, 31 L.P.R.A. sec. 2520. Para los casos en que el testador no disponga facultades especiales, enumera las conferidas por ley. Art. 824 del Código Civil, 31 L.P.R.A. sec. 2521. De particular importancia resulta la autorización al albacea, con la intervención de los herederos, a tomar las *precauciones necesarias* para la conservación y custodia de los bienes. Y por *precauciones necesarias* se visualizan las "medidas provisionales para evitar la pérdida o deterioro de aquellos, *sin que, en absoluto, quede facultado para posesionarse de los mismos* ni para administrarlos, salvo en cuanto las precauciones de que se trate impliquen o consistan precisamente en la tenencia o administración en cuestión". (Énfasis suplido.) Albaladejo, *op. cit.*, pág. 264. Véase J.L. Lacruz Berdejo, *Derecho de Sucesiones*, Barcelona, Ed. Bosch, 1971, Vol. I, pág. 772. Una cosa sí es clara: posesionarse o utilizar los bienes del caudal, sin la autorización del tutelar, es una *extralimitación* en el ejercicio de

su función, *incompatible con la naturaleza fiduciaria del albaceazgo.*

■ Una vez aceptado el cargo, el albacea se obliga a desempeñarlo fielmente. Art. 821 del Código Civil, 31 L.P.R.A. sec. 2518. Esto, unido a la exigencia de capacidad para obligarse, fortalece la teoría de que el albacea contrae una obligación de hacer. Art. 815 del Código Civil, 31 L.P.R.A. sec. 2512; Albaladejo, *op. cit.*, pág. 397. Su desempeño requiere la diligencia de un buen padre de familia. Art. 1057 del Código Civil, 3 L.P.R.A. sec. 3021; J.J. Gómez Ysabel, *Problemas fundamentales del ejercicio del albaceazgo*, Madrid, Ed. Reus, 1963, pág. 48.

■ El Código Civil no señala taxativamente la responsabilidad de los albaceas. Este vacío ha sido la génesis de un debate doctrinario entre muchos tratadistas que intentan ubicar el albaceazgo dentro de otras figuras definidas, tales como el mandato, la representación y la administración. J. Castán Tobeñas, *Derecho civil español, común y foral*, 6ta ed., Madrid, Ed. Reus, 1944, T. IV, pág. 610; F. Sánchez Román, *Estudios de Derecho Civil*, 2da ed., Madrid, Est. Tipográfico "Sucesores de Rivadeneyra", 1910, T. VI, Vol. 2, pág. 1380 y ss.; C. De Diego, *Instituciones de Derecho Civil Español*, Madrid, Artes Gráficas Julio San Martín, 1959, T. III, pág. 257 y ss.; M. Royo Martínez, *Derecho Sucesorio Mortis Causa*, Sevilla, Ed. Edelce, 1951, pág. 315; F. Bonet Ramón, *Jurisprudencia del Tribunal Supremo: comentario a sentencia Núm. 309 de 5 julio de 1947*, 31 Rev. Der. Priv. 868, 887 (1947); C. Valverde, *Tratado de Derecho Civil Español*, 4ta ed., Valladolid, Talleres Tipográficos Cuesta, 1939, T. V, pág. 350 y ss. Para otros la tarea es inútil, pues el albaceazgo tiene sus propios perfiles y autonomía. J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1975, T. V, Vol. 1, pág. 432, citando a Albaladejo, *op. cit.*, pág. 34, y a Puig Ferriol, *op. cit.*, pág. 42. Se admite, no obstante, que la responsabilidad dimanante se configura a base de la medida clásica de "buen padre de familia", lo cual nos permite auscultar con mayor detalle las formas variadas por las que se le puede exigir

responsabilidad. A tal efecto, el profesor González Tejera nos señala:

El albacea responde por abandono de sus deberes, desidia, mala administración, *apropiación indebida de los bienes del caudal*, dolo, malicia, gastos innecesarios o injustificados, litigios temerarios, negligencia, mala administración, demora injustificada en la entrega de los bienes, etc. (Énfasis suplido.) E. González Tejera, *Derecho Sucesorio Puertorriqueño*, San Juan, Ramallo Bros. Printing, 1983, Vol. 2, pág. 502.

■ Una vez determinada su responsabilidad, el albacea viene obligado a responder *como cualquier deudor.* Sus actuaciones generan una obligación de indemnizar a los herederos y demás causahabientes por todos los perjuicios causados. Obligación que, por no estar sometida a condición ni plazo, por mandato expreso del Código Civil es "exigible *desde luego*". (Énfasis suplido.) Art. 1066 del Código Civil, 31 L.P.R.A. sec. 3041. Y, tratándose de una obligación pura, una vez el acreedor solicita la prestación, el deudor viene obligado al cumplimiento específico e inmediato sin que la forma del cumplimiento quede a su voluntad exclusiva.

## III

■ Según antes transcrito, el Art. 822 del Código Civil dispone que el albacea que renuncia a su cargo sin justa causa pierde, con excepción de su derecho a la legítima, lo que le hubiera dejado el testador, incluso salarios, legados o herencia. González Tejera, *op. cit.*, pág. 506. Esta disposición se inspira en la idea de que tal actuación "ofende en cierto modo la memoria del testador, que en él confiaba . . . ya que rehúye la obligación de cumplir la parte gravosa, o sea el albaceazgo, la ley presume que tampoco acepta la parte beneficiosa, lo dejado por el testador". J.M. Manresa, *Comentarios al Código Civil Español*, 8va ed., Madrid, Ed. Reus, 1973, T. VI, Vol. II, pág. 663. Es un "castigo al antilegal proceder del nombrado albacea". Q.M. Scaevola, *Código Civil*, 4ta ed., Madrid, Ed. Reus, 1945, T. XV, pág. 541.

■ El peso de la prueba para demostrar la existencia de justa causa recae sobre el albacea. Aunque el Código Civil no regula la forma de la renuncia, señala que se hará por "causa justa al prudente arbitrio del Tribunal Superior". Art. 821 del Código Civil, *supra*. Basta con que el albacea alegue justa causa sin necesidad de especificar el motivo. Ahora bien, *una vez se cuestiona* la existencia de causa justificada, el albacea viene obligado a probar el hecho en que se funda su renuncia. E. Casasus, *La Renuncia al Albaceazgo*, Año XVI (Núm. 67) Rev. Der. Not. 31 (1970).

■ La determinación de justa causa corresponde al Tribunal Superior. La encomienda no es sencilla, pues el Código Civil deja de tipificar las causales que eximen al albacea de cumplir sus obligaciones sin consecuencia ulterior. Estamos en una zona dinámica en que el marco decisorio que ha de nutrir el discernimiento judicial es tan amplio como el entorno social vivo que la produce. D. José Antonio Doral, en ocasión de comentar la *amplitud* del concepto "justa causa" nos dice:

> . . . [L]a tipicidad de la causa no significa legalismo, sino protección de intereses que varían según criterios de equidad y de justicia, que son también sustancialmente variables. De aquí que el entronque de la voluntad con el Derecho no sea algo meramente estructural, sino ante todo expresión tangible de la dinámica social. Es así como la tipicidad de la causa es a la vez tipicidad social.
>
> La *justa causa* aplicada a la relación negocial, al desenvolvimiento de las relaciones jurídicas, permite la flexibilidad y la acomodación de los tipos a la vida, al tráfico jurídico, a la realidad cambiante. (Énfasis suplido.) B. Pellisé Prats, *Nueva Enciclopedia Jurídica*, Barcelona, Ed. Francisco Seix, 1971, T. XIV, pág. 631.

Es obvio, pues, que el contenido del concepto "justa causa" se da en función de las obligaciones del albacea y su interacción con los intereses sociales protegidos por dicha institución jurídica. La existencia y determinación de justa causa para renunciar debe hacerse considerando la presencia de buena fe, las obligaciones del albacea, el testamento, el caudal y, claro está, los derechos de los herederos.

Bajo este prisma, sin ser exhaustivos, reconocemos como causas justificadas para renunciar al albaceazgo la imposibilidad de seguir desempeñando el cargo sin *grave* detrimento del albacea o detrimento de los herederos legatarios, y las dificultades en su gestión. Véase Albaladejo, *op. cit.*, pág. 549 y ss. Ahora bien, la existencia de cualquier causal está subordinada a la ausencia de culpa o negligencia en el cumplimiento de los deberes inherentes al albaceazgo.

En este caso no hubo alegación de justa causa por parte de Ellis J. De ordinario ello hubiese sido suficiente. Sin embargo, es ante la solicitud de Félix para que se *aplique la sanción* dispuesta en el Art. 822 del Código Civil, *supra*, que por *primera vez* se cuestiona la existencia de causa justificada. *Ante esta situación el tribunal debió ordenar una vista para determinar si las motivaciones de Ellis constituían justa causa que le eximiera de la penalidad esbozada en el citado Art. 822. Procede decretar ese trámite.*

## IV

El foro primario se negó a ordenar la tasación de las propiedades donadas a los herederos. Se fundó en que tal operación *dilataría* la partición y *conllevaría gastos considerables.*

Un análisis de la figura de la colación nos obliga tomar un curso decisorio distinto. El fundamento utilizado por el tribunal de instancia, aunque pragmático en términos de economía judicial, no supera la justicia lógica que inspira la colación.

". . . [L]a colación consiste en la adición contable a la herencia del importe de las donaciones que en vida otorgó el causante a los herederos que son legitimarios . . . ." Puig Brutau, *op. cit.*, 1964, T. V, Vol. 3, pág. 643. Se funda en una presunción de trato igual a los legitimarios, que considera lo entregado en vida por el donante a sus herederos forzosos sólo como un anticipo de la participación en la herencia. González Tejera, *op. cit.*, pág. 380. Dicha presunción únicamente se destruye por la intención mani-

fiesta en sentido contrario conocida como *dispensa de colación*. Art. 990 del Código Civil, 31 L.P.R.A. sec. 2842.

 Comenta otra vez el profesor González Tejera que, aunque el Código Civil no regula la forma y el momento de realizar la dispensa de colación, la doctrina acepta que la misma se puede hacer en el mismo acto de donación o posteriormente. González Tejera, *op. cit.*, pág. 401. Otros comentaristas concurren sobre la revocabilidad de la dispensa de colación. Manresa, *op. cit.*, 6ta ed., 1943, Vol. VII, pág. 561; J. De Los Mozos, *La Colación*, Madrid, Ed. Rev. Der. Privado, 1965, pág. 273.

En el drama ante nos, en sus respectivos testamentos los causantes don Félix y doña Aurelia *revocaron expresamente* las dispensas de colación contenidas en las escrituras de donación números once (11), trece (13) y veinticinco (25), otorgadas ante el notario Waldemar Del Valle López durante 1977. Es imperativa, pues, la colación de los bienes donados.

### V

En vida, don Félix y doña Aurelia llevaban un sistema de libros de contabilidad para las operaciones de sus negocios en los que también registraban las cuentas corrientes abiertas por sus hijos. Éstos, para enero de 1984, adeudaban más de cuarenta mil dólares ($40,000). Sin embargo, Filihilda González no tenía cuenta corriente.

Antes de sus muertes, ambos progenitores condonaron a cada uno de sus hijos la cantidad de cuarenta mil dólares ($40,000). Lo hicieron mediante una operación de contabilidad en la que *abonaron* dicha cantidad a las cuentas. Como Filihilda no tenía deuda, ellos, con ánimo de tratarla igual, le acreditaron a su favor en los libros la suma de cuarenta mil dólares ($40,000). Lamentablemente *fallecieron antes de entregarle esa suma*. Por esa razón Filihilda requirió del albacea el cumplimiento y pago de la alegada donación. Tras varias gestiones infructuosas, lo solicitó del tribunal. Con la oposición de Félix, el tribunal así lo ordenó. *Incidió.*

 El Código Civil define la "donación" como un acto de liberalidad mediante el cual una persona dispone gratuitamente de una cosa en favor de otra que la acepta. Art. 558 del Código Civil, 31 L.P.R.A. sec. 1981. Se trata de un modo especial de trasladar y adquirir la propiedad y el dominio de bienes muebles e inmuebles. *Lage v. Central Fed. Savings*, 108 D.P.R. 72 (1978). Sólo se perfecciona a través de tres (3) actos: oferta del donante, aceptación del donatario y la notificación de esa aceptación al donante. *Guzmán v. Guzmán*, 78 D.P.R. 673 (1955).

 La donación de bienes muebles podrá hacerse verbalmente o por escrito. *En caso de que se haga verbalmente, se exige la entrega simultánea de la cosa donada.* Art. 574 del Código Civil, 31 L.P.R.A. sec. 2009. Si no hay esa simultaneidad, la donación *no surtirá efecto* a menos que la oferta y aceptación consten por escrito. *Dávila v. Agrait*, 116 D.P.R. 549, 566 (1985). La donación se perfecciona desde que el donante conoce la aceptación del donatario. Art. 565 del Código Civil, 31 L.P.R.A. sec. 1988. Nos ilustra Puig Brutau:

> . . . En la donación promisoria *es un buen criterio de política jurídica*, no sólo imponer siempre la forma escrita, sino considerar que el donante no queda obligado hasta que haya llegado a su conocimiento la aceptación del donatario. (Énfasis suplido.) Puig Brutau, *op. cit.*, 1982, T. II, Vol. 2, pág. 92.

El razonamiento del ilustrado tribunal de instancia es contrario a esta normativa. Aun si consideramos la entrada de cuarenta mil dólares ($40,000) en los libros a favor de Filihilda como una oferta, *no se perfeccionó la donación.* No hay prueba que fuera aceptada, según requiere el Art. 574 del Código Civil, *supra.* Tampoco se evidenció el conocimiento de la aceptación por parte de los donantes.

Por los fundamentos expuestos, *se dictará sentencia revocatoria. Continuarán en instancia los trámites ulteriores compatibles con lo resuelto.*

El Juez Asociado Señor Alonso Alonso concurre con el resultado sin opinión escrita. El Juez Asociado Señor Hernández Denton no intervino.