EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Sucesión José A. Toro Morales, et al<br><br>Demandantes-Peticionarios<br><br>v.<br><br>Sucesión de Nicolás Toro Cruz, et al<br><br>Demandados-Recurridos | Certiorari<br><br>2004 TSPR 41<br><br>161 DPR \_\_\_\_ |

Número del Caso: CC-2002-714

Fecha: 17 de marzo de 2004

Tribunal de Circuito de Apelaciones:

       Circuito Regional IV

Juez Ponente:

       Hon. Yvonne Feliciano Acevedo

Abogado de la Parte Peticionaria:

       Lcdo. Andrés García Arache

Abogado de la Parte Recurrida:

       Lcdo. Fernando L. Sepúlveda Silva


Materia: División de Bienes Hereditarios

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Sucesión José A. Toro
Morales, et al

   Demandantes Peticionarios

      v.                            CC-2002-714    Certiorari

Sucesión de Nicolás Toro
Cruz, et al

   Demandados Recurridos

Opinión del Tribunal emitida por el Juez Asociado señor Hernández Denton

San Juan, Puerto Rico, a 17 de marzo de 2004.

En el recurso de autos nos corresponde resolver si la cantidad que debe traer un heredero forzoso al caudal hereditario en un proceso de colación, es el valor del bien donado al momento de la donación o su precio en el mercado cuando se divide la herencia.

Los integrantes de la sucesión Toro-Morales solicitan que revoquemos las decisiones del Tribunal de Circuito de Apelaciones y del Tribunal de Primera Instancia, que concluyeron que el Art. 999 del Código Civil dispone que para efectos de la colación se computaría el valor del bien donado al momento del acto de liberalidad a una de las herederas y no su precio en el mercado

al momento de la partición del caudal de su padre. Confirmamos.

I

Don Nicolás Toro Cruz falleció intestado en Mayagüez, Puerto Rico, el día 17 de noviembre de 1991. Al momento de su fallecimiento había procreado 13 hijos producto de tres relaciones distintas.

En su primer matrimonio con la Sra. Gloria Morales, procreó tres (3) hijos; Feliberto, Gladys, y José A., todos de apellidos Toro Morales. Este último ya fallecido, y a quien le sobrevivieron su cónyuge Myrtelina Carlo y sus hijos Vanesa Toro Carlo y José A. Toro Carlo. Todos estos componen la parte demandante-peticionaria.

Luego de su divorcio de la Sra. Gloria Morales, el señor Toro Cruz contrajo matrimonio con la Sra. Isabel Asencio, con quien procreó ocho (8) hijos, cuyos nombres son los siguientes: Cynthia, Nicolás E., Santos Antonio, Eva I., Evelyn, Madelline, Ana Dora y Earline, todos de apellidos Toro Asencio. Además, como resultado de sus relaciones extramaritales, Don Nicolás Toro Cruz procreó dos (2) hijos adicionales, Ricardo A. Toro Torres y Waldemar Toro Torres.

Los hijos de su primer matrimonio (en adelante, Sucesión Toro Morales), presentaron demanda sobre división de bienes contra los integrantes de las sucesiones Toro Asencio y Toro Torres. Alegaron haber sido adversamente afectados en sus derechos hereditarios por una compraventa

llevada a cabo entre una de las codemandadas, Cynthia Toro Asencio, y sus padres, Nicolás Toro Cruz e Isabel Asencio. Adujeron que en la mencionada compraventa hubo una donación subyacente ya que el valor de la propiedad vendida por el matrimonio Toro-Asencio era mayor al valor pagado por la codemandada y compradora Cynthia Toro Asencio.[1] Eventualmente, los demandantes desistieron de su reclamación contra los otros demandados, quedando solamente como parte demandada, Cynthia Toro Asencio.

En miras a una transacción, y luego de múltiples incidentes procesales y de varios estudios de valoración, las partes acordaron que el tasador Félix J. Rodríguez valorara la propiedad en controversia; el resultado de esa tasación, según estipularon, sería obligatorio para las partes.

Posteriormente, y tras la repetida cercanía de una posible transacción que nunca se materializó, el Tribunal de Primera Instancia, Sala de Mayagüez, señaló el asunto para juicio. A tales efectos, las partes presentaron al foro de instancia varias estipulaciones de hechos y tres (3) informes de valoración de la finca objeto de controversia preparados por diversos peritos en fechas distintas.

---

[1] Es menester señalar que el caudal del señor Nicolás Toro Cruz **ya fue dividido** entre sus herederos. Por tanto, de estimar este Tribunal que los integrantes de la sucesión Toro-Morales tienen derechos hereditarios sobre el bien en cuestión, dicha cantidad será devuelta directamente a los demandantes y no al caudal relicto, ya que el mismo, en efecto, fue repartido.

Entre los hechos estipulados por las partes se señaló que la propiedad había sido vendida en 1987 a la parte demandada por la suma de cincuenta y cinco mil dólares ($55,000). Se estipuló además que la propiedad había sido valorada en _tres_ (3) ocasiones distintas. El valor de la propiedad, naturalmente, varía sustancialmente según la fecha en que se realizó la tasación.

El primer estudio de tasación sobre el bien en controversia fue procurado por la parte demandante y efectuado por el Sr. Rafael Arcaya Cruzado el 3 de marzo de 1995. Dicho estudio arrojó un valor, a esa fecha, de quinientos treinta seis mil dólares ($536,000).

El segundo estudio de tasación fue procurado por la parte demandada quien solicitó un estudio de valoración retroactivo a la fecha de la compraventa, es decir a 1987. Dicho estudio fue llevado a cabo por el Ing. Rafael Blanes con fecha de 18 de agosto de 1998, _y arrojó un valor retroactivo al 31 de agosto de 1987_, de doscientos cincuenta y ocho mil quinientos dólares ($258,500).

La tercera valoración del bien en cuestión fue, según mencionáramos anteriormente, procurada por ambas partes y llevada a cabo por el evaluador profesional Félix J. Rodríguez el 24 de febrero de 2000. Dicha valoración arrojó un valor de la propiedad, a esa fecha, de ochocientos treinta y tres mil dólares ($833,000).

Luego de los procedimientos de rigor, el Tribunal de Primera Instancia resolvió que el negocio realizado sobre

la propiedad en controversia fue una compraventa en cuanto a la porción onerosa del contrato y una donación en cuanto al resto de la transacción por lo que aplicó, en cuanto a esa porción, el derecho aplicable a las donaciones. En lo referente al cómputo del correspondiente derecho hereditario de las partes, dicho tribunal utilizó como base el costo en el mercado de la propiedad para el año 1987. Es decir, resolvió que para propósitos de la colación, se debe utilizar el valor de la propiedad al momento de la donación.

Así, estimó que la diferencia en precio entre la cantidad pagada, $55,000, y el valor del bien el momento de la donación, $258,000, era de $203,500. Dicho bien, no obstante, era ganancial al momento de la donación por lo que los demandantes, quienes sólo tienen derechos hereditarios sobre la mitad del señor Toro, tienen derecho, cada uno, a una treceava parte (1/13) de la mitad de la cantidad donada. En otras palabras, tienen derecho a una treceava parte de $101,750, que es la parte que le pertenecía al señor Toro. Luego de los cálculos de rigor, el Tribunal de Primera Instancia estimó que cada uno de los demandantes tiene derecho a la suma de siete mil ochocientos veintisiete dólares ($7,827).

Inconforme con dicha determinación, la Sucesión Toro Morales apeló al Tribunal de Circuito de Apelaciones quien, a su vez, confirmó el dictamen del foro de instancia. Es de esta determinación que acude ante nos dicha sucesión,

aduciendo que incidió el foro apelativo al confirmar la sentencia del Tribunal de Primera Instancia que decretó que la cantidad a colacionar es el importe del bien donado al momento de la donación. Sostienen también que el Tribunal de Circuito de Apelaciones se equivocó al resolver que no estaban obligados a acatar la tasación de febrero de 2000, cuando la misma fue producto de una estipulación entre las partes.

Ante este cuadro fáctico analicemos el derecho aplicable a la situación de autos.

## II

De entrada debemos precisar que el negocio envuelto en el caso de autos es una compraventa legal que incluye una donación subyacente. Ya antes habíamos señalado que un contrato de compraventa donde hubiere una donación subyacente se reputa válido conforme al Art. 1226 del Código Civil de Puerto Rico, 31 L.P.R.A 3431, siempre que en el mismo concurran los siguientes requisitos: 1) que el contrato otorgado que la encubre se haya otorgado mediante escritura pública; 2) que se describan individualmente los bienes donados, y en caso de donación onerosa, que se expresen las cargas que el donatario asume; y, 3) que se haga constar la aceptación del donatario en la misma o en una escritura separada, pudiendo deducirse tal aceptación de la firma del documento simulado. La Costa v. La Costa, 112 D.P.R. 9 (1982); Hernández Usera v. Srio. de Hacienda, 86 D.P.R. 13, 18 (1962).

En una situación como la de autos, donde el precio pagado por la propiedad es menor al justo valor en el mercado al momento del negocio jurídico, la diferencia entre dichas cantidades constituye una donación si la misma cumple con los requisitos antes esbozados, y es hecha de buena fe y sin intención de defraudar a los herederos legítimos. En tal eventualidad existiría causa para ambos contratos: en la compraventa sería el precio pagado y en la donación la mera liberalidad del donante.

En el caso de marras, las partes están de acuerdo en que en el contrato de compraventa hubo una donación subyacente y que la transacción es válida. Dicho contrato fue realizado mediante escritura pública, se describió el bien inmueble y se aceptó, por medio de la firma, la donación. Además, nunca se presentó prueba tendiente a demostrar que la donación fue hecha de mala fe o con intención de defraudar a los herederos legítimos.

Así, y debido a que no existe controversia en cuanto a la validez del negocio jurídico entre el matrimonio Toro-Asencio y su hija Cynthia Toro Asencio, queda por precisar la cantidad que le fue donada a la demandada de forma subyacente mediante el referido contrato de compraventa, para así determinar la cantidad que ésta debió colacionar en el proceso de partición de la herencia.

III

A

Según mencionáramos anteriormente, la controversia medular del caso de marras requiere que interpretemos el Artículo 999 del Código Civil, 31 L.P.R.A. 2851, y determinemos cuál es la fecha que ha de utilizarse para determinar el valor de la propiedad donada para propósitos de la colación; el momento de la donación o el momento de la partición del caudal.

En su alegato ante nos, la Sucesión Toro Morales sostuvo que para determinar la cuantía de los derechos hereditarios, se debe utilizar el valor en el mercado de la propiedad al momento de la partición. Añaden además que la última tasación efectuada en el año 2000 por el señor Félix J. Rodríguez era obligatoria para las partes, y no podía ser sustituida por otro informe de valoración. En la alternativa, aducen que de estimar este Tribunal que el valor a utilizarse al momento de la colación es aquél que tenía el bien al momento de la donación, procede retrotraer la cantidad señalada en el estudio de valoración del 2000 a la fecha de la donación.

Por su parte, la donataria sostiene que el momento a considerar para determinar el valor del bien hereditario en controversia es el de la donación.

El Art. 989 de nuestro Código Civil, 31 L.P.R.A. 2841, dispone, en esencia, que el heredero forzoso que concurra con otros deberá traer a la masa hereditaria los bienes que

en vida recibió del causante por donación u otro título lucrativo. Ello, con el fin de que los mismos sean computados en la división de las legítimas.

La colación, como es conocido dicho proceso, es un procedimiento de mera contabilidad mediante el cual se añaden al caudal hereditario los importes de las donaciones que en vida otorgó el causante a los herederos legitimarios. Dicha operación tiene como fin procurar entre los herederos forzosos un trato equitativo por presumirse que el causante no quiso tratarlos de forma desigual. Así, la donación otorgada a uno de ellos se considera un anticipo de su futura cuota hereditaria, salvo que el causante manifieste lo contrario y dispense de colacionar al donatario.

A falta de dispensa, el donatario, que a su vez sea heredero forzoso, tomará de menos en la división de la herencia, según lo que haya recibido en vida; recolectando sus coherederos el equivalente, según fuere posible, en bienes de la misma naturaleza, especie y calidad. *Véase*, Art. 1001 del Código Civil de Puerto Rico, 31 L.P.R.A. 2852.

Ahora bien, respecto a la forma de calcular lo que el donatario recibió en vida, cabe señalar que se ha generado una controversia doctrinal, tanto en España como en nuestra jurisdicción, en cuanto a si debe tomarse en consideración el valor original de dicha donación o el valor presente de dicha cantidad, a la luz del cambio de valoración en la

moneda y la economía. Es decir, el valor del bien al momento de la donación, o el valor efectivo actual tomando en consideración la oscilación de la moneda. *Véase* Vallet de Goytisolo, *Apuntes de Derecho Sucesorio*, Madrid, (1955) a la Pág. 589.

A tales efectos, Roca Sastre, quien estima que en la partición debe computarse el valor *nominal*,[2] o valor original, que tenían los bienes colacionables al momento de hacerse la donación, señala lo siguiente:

> Las cosas objeto de la liberalidad colacionable se estiman por el valor que tenían al tiempo de otorgarse efectivamente la liberalidad, o sea de efectuarse la entrega o inversión, aunque no se hubiese hecho entonces su justoprecio. No se tiene en cuenta la depreciación monetaria, salvo que se hubiere establecido cláusula de estabilización. El aumento como el deterioro posterior, y aún la pérdida total, causal o culpable, del objeto de la liberalidad colacionable, será a beneficio o a cargo y riesgo del donatario. (Énfasis nuestro) Roca Sastre, *Anotaciones a Kipp, II*, Pág. 60 de la 1ª edición y Pág. 312 de la 2ª.

Por el contrario, Núñez Lagos, Vallet y LaCruz Berdejo, según citados por Puig Brutau en su obra *Fundamentos de Derecho Civil, V-3,* a la Pág. 643, estiman que "se trata de un *quantum* del activo hereditario. Es pues una deuda de cantidad, en la subclase de deuda de valor, por lo que su cuantía deberá ser la concurrente para

---

[2] Cabe señalar que los comentaristas españoles llaman valor "nominal" al valor que hemos denominado como valor "original". Es decir, el valor del bien al momento de la donación. Por otro lado, la tradición civilista denomina valor "real" al valor "presente" de dicha cantidad. A este último también se le conoce como "valor actuarial".

compensar el valor *real* [o presente], según los números índice en el momento de la donación, de los bienes donados en vida por el causante". (Énfasis suplido) En otras palabras, hay que estimar el valor de lo donado en el momento del acto de liberalidad, pero con arreglo a las circunstancias monetarias del día del fallecimiento. Federico Puig Peña, *Compendio de Derecho Civil Español Tomo VI,* Ediciones Pirámide, Madrid, (1976), a la Pág. 100.

De esta manera, según LaCruz Berdejo, se mantiene el valor del bien al momento de la donación, según exige la ley, a la vez que se evita que por pérdida del valor de la moneda quede la cantidad originalmente colacionable muy por debajo del valor real del bien. Ello supone cierta igualdad de valor entre el bien donado y los bienes que, de la misma especie, existan aún en la herencia. *Véase*, Puig Brutau, *supra*, a la Pág. 643.

A raíz de esta disputa doctrinal, en 1981 el legislador español enmendó el artículo 1.045 de su Código Civil, correspondiente al Art. 999 del nuestro, 31 L.P.R.A., 2851, para que dispusiese así:

> No han de traerse a colación y partición las mismas cosas donadas, sino su valor al tiempo en que se evalúen los bienes hereditarios.
>
> El aumento o deterioro físico posterior a la donación y aun su perdida total, causal o culpable, será a cargo y riesgo o beneficio del donatario. (Énfasis nuestro)

Como bien explica el Profesor Efraín González Tejera, a partir de la reforma del derecho de sucesiones español de

1981, los bienes donados se evalúan al hacerse la partición, pero tal como se recibieron al momento de la donación. *Véase* su obra, *Derecho de Sucesiones Tomo I,* Editorial de la Universidad de Puerto Rico, Pág. 526. En otras palabras, en España se colaciona una cantidad actual que iguale el poder adquisitivo que tenía la cantidad donada al momento de la donación. González Tejera citando a O'Callaghan a la Pág. 526 de su texto.

Es preciso aclarar, no obstante, que en Puerto Rico <u>no se ha incorporado</u> la enmienda que sufrió el artículo 1.045 español, por lo que el Art. 999 de nuestro Código Civil, *supra*, sigue estableciendo lo siguiente:

> No han de traerse a colación y partición las mismas cosas donadas o dadas en dote, <u>sino el valor que tenían al tiempo de la donación</u> o dote, aunque no se hubiese hecho entonces su justoprecio.

Según se puede apreciar, nuestro Código Civil establece <u>clara e inequívocamente</u>, que para propósitos de la colación se tomará en consideración el **valor que tenía el bien al momento de la donación**.[3] Ello, sin abstracción de las vicisitudes posteriores en el valor del bien o la moneda.[4] De estimar el donante que el valor del bien debe

---

[3] **Si bien es cierto que el Profesor González Tejera discrepa de la teoría del valor *nominal*, no menos cierto es que dicho autor <u>acepta</u> que el Art. 999 de nuestro Código Civil limita la obligación del donatario al valor nominal de lo donado <u>a la fecha de la donación</u>.** Derecho de Sucesiones Tomo I, Pág.526.

[4] Debe tomarse también en consideración que Puerto Rico no confronta los mismos problemas que las naciones europeas con relación a la oscilación del valor de la moneda. Factor importante tomado en cuenta por los legisladores españoles al enmendar su código.

ajustarse a las fluctuaciones monetarias, deberá así especificarlo al momento de la donación.[5]

Según es sabido, es un principio establecido de hermenéutica judicial que ante un lenguaje claro e inequívoco del legislador, el texto de la ley es la expresión por excelencia de la intención legislativa. Por otro lado, es harto conocido que "[l]as palabras de la ley deben ser generalmente entendidas en su más corriente y usual significación", atendiendo al uso general y popular de las voces. *Véase*, Art. 15 del Código Civil, 31 L.P.R.A. 15. El lenguaje de la frase **"valor que tenía el bien al momento de la donación"** es inequívocamente patente, por lo que no debe ser interpretado de otra manera.

Queda pues meridianamente claro que el valor a utilizarse al momento de colacionar <u>es el valor que tenía el bien al momento de la donación</u>, y no al momento de la partición, según alegan los peticionarios.[6]

B

En el caso de autos, el matrimonio Toro-Asencio le vendió a su hija Cynthia una finca de 41.92 cuerdas sita en el Bo. Boquerón de Cabo Rojo por el precio de $55,000. No está en

---

[5] Nuestra Asamblea Legislativa ha optado por no enmendar el referido artículo, <u>a pesar de que conoce de la enmienda llevada a cabo en el Código Civil español</u>. Así se desprende del estudio preparado por la *Comisión Conjunta Permanente para la Revisión y Reforma del Código Civil de Puerto Rico.*
[6] La parte demandante sostiene que el valor de los bienes hereditarios se calcula al momento de la partición. Cabe señalar, no obstante, que la finca en controversia, **ya no era parte del caudal hereditario**. La misma había sido vendida a la señora Cynthia Toro, por lo que no puede computarse como parte del caudal relicto.

discusión la existencia de una donación subyacente válida dentro de dicho contrato. Tampoco está en controversia que la diferencia entre el valor del bien en aquel momento y la cantidad pagada por la demandada constituye una donación que, por ser en efecto un adelanto de la legítima de una heredera forzosa, era colacionable.

Por otro lado, las partes estipularon que hubo tres (3) valoraciones distintas del bien en cuestión. Una llevada a cabo en 1995 que arrojó un valor de $536,000. Otra llevada a cabo en 1998, pero ajustada a 1987, momento en que se llevó a cabo el negocio jurídico entre la demandada y sus padres, que arrojó un valor de $258,000. Y una última valoración efectuada en el 2000 que arrojó un valor de $833,000.

Según señalamos anteriormente, el Art. 999 de nuestro Código Civil, *supra*, establece que para propósitos de la colación, el valor que ha de utilizarse es aquél que tenía el bien donado al momento del acto de liberalidad. De las tres tasaciones, la única que se remonta a la fecha de la donación es la efectuada por el señor Rafael Blanes en 1998, la cual arrojó un valor nominal a 1987 de $258,000, por lo cual es esa la cantidad que se debió utilizar al momento de determinar el valor del bien donado para propósito de la colación.[7]

---

[7] Claro está, a dicha cantidad se le ha de restar la cantidad pagada por la demandada.

C

Por otro lado, no le asiste la razón a la Sucesión Toro-Morales (parte demandante) al sostener que el juzgador está obligado a acatar el informe de valoración del año 2000 que valoraba el bien donado en $833,000. Máxime, cuando así hacerlo contravendría el derecho vigente que dispone que el valor del bien donado se calcula al momento del acto de liberalidad. Cabe señalar que el acuerdo al que hace referencia la parte demandante se dio en miras a una transacción que nunca se configuró, por lo que no puede obligar al juzgador del caso de autos.[8]

De los autos del recurso surge que previo a la vista del caso en su fondo las partes sometieron sendos memorandos de derecho con varias estipulaciones, entre las cuales se estableció que las partes habían llevado a cabo tres (3) valoraciones del bien inmueble. Además, la propia parte demandante aceptó en un escrito posterior presentado ante el foro de instancia que existían tres (3)

_____

[8] Según mencionáramos, las partes estipularon que el señor Félix J. Rodríguez llevara a cabo una valoración del bien en cuestión. Dicha Tasación arrojó un valor para el año 2000 de $833,000. Nadie está cuestionando que ese era el valor de dicha propiedad para ese momento. Sin embargo, la controversia de autos precisa determinar la cantidad que la demandada ha de colacionar. Y la cantidad que la misma ha de colacionar dependerá, necesariamente, del valor del bien al momento de la donación. No olvidemos que los demandantes siempre estimaron que la cantidad a colacionar dependería del valor del bien al momento de la partición por lo que era sumamente importante para su argumento que el valor utilizado fuera el de la tasación más reciente. Además, de ser cierto el argumento de la parte demandante, dicha estipulación hubiese dispuesto del caso en su totalidad por lo que hubiese sido innecesario llevar a acabo un juicio en su fondo.

valoraciones distintas del bien en cuestión, sin argumentar en momento alguno que el juzgador estaba obligado por la última tasación, o que estaba en desacuerdo con el resultado del estudio llevado a cabo por el señor Rafael Blanes.[9] Por tanto, decretamos que actuó correctamente el tribunal *a quo* al rechazar el argumento de la parte demandante-recurrente de que el estudio de valoración del año 2000 era obligatorio tanto para las partes como para el juzgador de autos.

D

Por último, tampoco tiene razón la Sucesión Toro-Morales al estimar que en la alternativa de que, contrario a lo que ellos estiman, este Tribunal decrete que el valor a utilizarse es aquél que tenía el bien al momento de la donación, procede en derecho utilizar la valoración llevada a cabo en 2000 y retrotraerla a la fecha de la donación utilizando un "Ajuste de Tiempo Retroactivo" de 3.5% anual. Dicho cómputo, según la parte demandante, arroja un valor de la propiedad a 1987 de $523,617.70.[10] Valor, según ellos, muy superior al señalado por el señor Blanes en su estudio de valoración.

Según aclaráramos previamente, no estamos obligados por el estudio de valoración del año 2000. Por otro lado,

---

[9] *Véase* el Memorando de la Parte Demandante de la Pág. 138 del expediente, exhibit 24 del Apéndice, que lee así: "Hay tres (3) evaluaciones que demuestran fluctuaciones considerables en los valores desde la muerte del causante hasta el presente, y que se extenderá hasta que se efectúe la partición, y que deben aprovechar a todos los herederos.
[10] Este cómputo fue hecho mediante un "Ajuste de Tiempo Retroactivo" o "cambio promedio porcentual anual" de 3.5%.

cabe señalar que el valor de un bien inmueble a una fecha pasada no se calcula según lo estima la parte demandante. Es decir, no se utiliza un cómputo automático y generalizado donde se descuenta del valor actual del bien, el cambio promedio porcentual anual. El producto de dicho cálculo sería incorrecto e impreciso ya que, entre otras cosas, le adjudicaría a la propiedad un valor a 1987 que toma en consideración los aumentos posteriores y naturales de los bienes inmuebles.[11]

Por el contrario, según se desprende del Informe del Ingeniero Blanes, un estudio de valoración retroactivo debe tomar en consideración las ventas de propiedades similares en el mismo vecindario con usos y fines parecidos a la propiedad evaluada para la fecha en cuestión[12] (las llamadas ventas comparables), el valor depreciado de las mejoras de dicha propiedad más el valor del terreno basado en ventas de propiedades parecidas[13], o la capacidad de generar rentas netas en el mercado típico en que se encuentra si dicha

---

[11] Tomemos como ejemplo una propiedad a la que luego de 15 años de donada, le construyen en un área cercana un complejo turístico de lujo. Dicha propiedad, naturalmente, aumentará sustancialmente de valor como consecuencia de dicha construcción. Si tomamos el valor de la propiedad luego de la construcción del complejo turístico, y le hacemos un "Ajuste de Tiempo Retroactivo", según sugiere la parte demandante, el valor del bien al momento de la donación sería uno artificialmente alto, ya que se tomó en consideración el aumento posterior de dicho bien. Dicha suma, no refleja la cantidad real que una persona hubiese pagado por esa propiedad hace 15 años.

[12] Éste es el llamado enfoque de ventas o mercadeo.

[13] Éste es el llamado enfoque de costo o reproducción, en el cual es menester que el terreno esté en su mejor o más provechoso uso, y que las mejoras existentes guarden relación con el mejor uso del terreno.

propiedad está expuesta a dicho mercado de rentas.[14] Dichos estudios toman además en consideración otros factores como la localización y el uso más provechoso de dicha propiedad, entre múltiples otros factores.[15] *Véase*, Informe de Valoración del señor Blanes.

Por tanto, queda meridianamente claro que no tiene razón la Sucesión Toro-Morales al estimar que el valor del bien en cuestión a la fecha de la donación era $523,617.70 sin tomar en consideración, al efectuar el cómputo por ellos propuesto, las distintas variables que deben ser estudiadas al estimar el valor de una propiedad para un momento pasado específico.[16]

IV

No albergamos dudas sobre la validez del estudio de valoración retroactivo efectuado por el Ingeniero Blanes. Tampoco alojamos dudas a los efectos de que los foros *a quo* no estaban obligados, como tampoco lo estamos nosotros, a acatar el estudio de valoración de febrero de 2000. Por último, consideramos que procedieron correctamente el tribunal de instancia y el foro apelativo al estimar que la cantidad que debe traer un heredero forzoso a la masa hereditaria para efectos de la colación, es el valor que

---

[14] Éste es el llamado enfoque de renta o capitalización.

[15] El ajuste de tiempo retroactivo es sólo uno de múltiples cómputos utilizados en un estudio de valoración.

[16] Aceptar dicho cómputo significaría que el bien en cuestión sólo aumentó $12,382.30 en un período de ocho años. Ello, ya que el estudio de valoración de la propia parte demandante de 1995 estimó que el valor de la propiedad a esa fecha era de $536,000.

tenía el bien donado <u>al momento de dicho acto de liberalidad</u>.

En el caso de marras, la cantidad donada asciende a $203,500.[17] Por tanto, actuaron correctamente el Tribunal de Circuito de Apelaciones y el Tribunal de Primera Instancia al resolver que cada uno de los demandantes tiene derecho a la suma de siete mil ochocientos veintisiete dólares ($7,827).

Por los fundamentos antes expuestos, procede confirmar los dictámenes del Tribunal de Circuito de Apelaciones y el Tribunal de Primera Instancia, y se devuelve el recurso para que se prosiga de forma consistente con lo aquí resuelto.

Se dictará la Sentencia correspondiente.

Federico Hernández Denton
Juez Asociado

---

[17] Dicha cantidad surge restando del valor total del bien en cuestión, la cantidad pagada por la demandada en 1987.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Sucesión José A. toro
Morales, et al

  Demandantes Peticionarios

  v.                                      CC-2002-714      Certiorari

Sucesión de Nicolás Toro
Cruz, et al

  Demandados Recurridos

SENTENCIA

San Juan, Puerto Rico, a 17 de marzo de 2004.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integral de la presente, se dicta sentencia y se confirman los dictámenes del Tribunal de Apelaciones y el Tribunal de Primera Instancia y se devuelve el recurso para que se prosiga de forma consistente con lo aquí resuelto.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri emitió Opinión Disidente, a la cual se unió la Juez Asociada señora Fiol Matta.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Sucesión José A. Toro Morales,
Et Al.

    Demandantes-Peticionarios

          vs.              CC-2002-714       Certiorari

Sucesión de Nicolás Toro Cruz,
Et Al.

    Demandados-Recurridos


Opinión Disidente emitida por el JUEZ ASOCIADO SEÑOR FUSTER BERLINGERI, a la cual se une la JUEZ ASOCIADA SEÑORA FIOL MATTA.


San Juan, Puerto Rico, a 17 de marzo de 2004.


Al interpretar el significado y alcance del Art. 999 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2851, **es meridianamente claro** que para colacionar los bienes donados, se ha de tomar el valor de éstos al momento de la donación **y no su valor actual en el mercado**. Así pues, en un caso como el de autos, al hacer la colación correspondiente no puede tomarse para ello la suma de $833,000 calculada por un evaluador profesional como el actual valor en el mercado del bien donado. El propio Código **y la doctrina uniformemente** coinciden en que al colacionar el bien donado es menester tomar el valor de éste al momento de haberse hecho la donación, de modo que lo que el

valor del bien en cuestión haya aumentado durante el lapso de tiempo entre la donación y la muerte del causante, le beneficia al donatario.

Así pues, como tantas veces ha sucedido en Puerto Rico, si una finca o un solar era de naturaleza agrícola al momento de la donación pero décadas más tarde esa finca o solar se ha convertido en una codiciada propiedad turística, industrial o comercial, la correspondiente multiplicación de su valor resultante del referido cambio en las circunstancias, le beneficia al donatario, tal como le beneficiarían las ganancias obtenidas de los frutos agrícolas de haberse cultivado dicha propiedad para tales fines durante el tiempo en cuestión. Sobre el referido aumento en valor no puede existir controversia porque el derecho aplicable es meridianamente claro.

Ahora bien, el Art. 999 del Código Civil sí presenta una cuestión **que se parece, pero realmente es muy distinta a la mencionada en los dos párrafos anteriores**, sobre la cual existe alguna división entre las voces más autorizadas del Derecho Civil. Esa cuestión es la de **cómo debe determinarse el valor de la propiedad donada al momento de la donación**. Específicamente la cuestión es si debe tomarse en cuenta el **valor nominal** de ésta al momento de la donación, o si, en cambio, debe tomarse en cuenta su **valor real** en dicho momento. La cuestión surge no por razón de que con el pasar del tiempo haya ocurrido una transformación en la **utilidad** de la propiedad, que es lo que se señaló antes, sino porque con el pasar del tiempo **la moneda se ha devaluado**, de manera tal que su valor nominal no corresponde ya al valor real que tenía en aquel momento. Dicho de manera sencilla, el problema surge por razón de que **un dólar hoy no**

**vale lo mismo que valía un dólar hace 25 años**. Así pues, para ilustrar concretamente el asunto, décadas atrás con un dólar se compraban varios galones de gasolina mientras que ahora con un dólar sólo se compran unos pocos litros. Décadas atrás con un dólar se compraban cuatro docenas de huevos mientras que ahora un dólar no da ni para una docena. Décadas atrás una finca que valía, digamos, $100,000 constituía una fortuna; hoy día con $100,000 escasamente se puede comprar una residencia de bajo costo en una modesta urbanización.

La cuestión debatida en la doctrina sobre el asunto que aquí nos concierne es si al determinar el valor de la propiedad donada al momento de la donación, se ha de tomar el costo que tenía la propiedad en esa época a base de lo que representaba la moneda entonces (valor real) o si se va a tomar ese costo a base de lo que representa la moneda actualmente (valor nominal). Si el costo de la propiedad entonces fue de $100,000, **la cuestión es si se colaciona la propiedad a base de lo que significaba $100,000 entonces (valor real) o si se hace a base de lo que significan $100,000 actualmente (valor nominal)**.

La opinión sobre el asunto referido prevaleciente entre la **inmensa mayoría** de la crítica erudita es que lo justo y lo propio es que se haga la colación a base del **valor real** del bien donado al momento de la donación. Ello quiere decir, en el ejemplo anterior, que se le asigne ahora en la colación al inmueble que costó $100,000 un precio que refleje realmente lo que significaba $100,000 en la época en que se hizo la donación. Tal es la postura para **casos como el de autos**[18] de numerosos

---

[18] Es menester aclarar que algunos de estos comentaristas, como Vallet de Goytisolo y Puig Peña tienen una posición

eminentes comentaristas del Derecho Civil como son Manresa, LaCruz Berdejo, Núñez Lagos, Vallet de Goytisolo, Puig Peña y Puig Brutau. Es, además, la postura prevaleciente de la doctrina alemana, expuesta por Kipp y otros eminentes juristas de ese país, según lo relata Puig Peña. *Compendio de Derecho Civil Español*, Vol. VI, Pág. 101 (1976). Es, así mismo, la posición que González Tejera favorecería aquí en Puerto Rico. *Derecho de Sucesiones*, Tomo 2, págs. 472-473 (2002).

La postura de tantos eminentes comentaristas del Derecho Civil referida antes tiene una razón de ser muy clara y muy importante. Se trata aquí de un mecanismo —la colación— que existe en el ordenamiento jurídico precisamente **para proteger la legítima de los herederos forzosos**. En nuestro sistema legal, como en otros de enfoque civilista, si el causante no dispone lo contrario, prevalece el principio medular de que la donación que un causante hace en vida a sus herederos forzosos se realiza **a cuenta de la cuota hereditaria de dichos herederos**. Se considera como un adelanto que el causante les hace a éstos. Para darle efectividad a dicho principio fundamental el ordenamiento civilista establece el mecanismo de la colación al momento de la partición. Todo este entramado de nuestro derecho sucesorio perdería su propósito esencial de proteger la legítima si el bien donado se colaciona a base de su valor nominal en aquellos casos como el de autos en los cuales el valor de la moneda se ha deteriorado sustancialmente por el largo lapso de tiempo transcurrido entre la fecha de la donación y la fecha de la muerte del causante. Como bien lo indica González Tejera en su

---

distinta **en otras circunstancias**. Pero, **en casos como el de autos**, su parecer claramente coincide con el de los que apoyan el criterio del valor real del bien donado.

obra citada antes, si se mantiene el valor nominal de la donación al momento de la partición, ello "...**llevaría a una endeble justicia distributiva de la legítima en nuestro medio porque... el donatario... muchas veces colacionaría una cifra ridículamente baja en comparación con el valor total recibido**." Quedaría seriamente menoscabada la legítima de los herederos forzosos, a pesar del alto valor que tiene la normativa del propio Código Civil que procura evitar la preterición del heredero forzoso.

En el caso de autos, la mayoría del Tribunal no ofrece ningún raciocinio adecuado para apartarse de lo que postulan la mayoría de los más eminentes civilistas sobre el asunto en cuestión. El equívoco señalamiento de que su postura la requiere el Art. 999 de nuestro Código Civil está contradicho precisamente por la controversia doctrinal misma a la que alude la mayoría del Tribunal en su opinión sobre el asunto. Esa controversia trata específicamente sobre cómo debe interpretarse la norma contenida en el referido Art. 999. Por ello no puede decirse lógicamente que dicho artículo ordena aquello que es precisamente objeto de una histórica controversia sobre lo que el mismo dispone.

El resultado neto de la postura mayoritaria en el caso de autos es que, en palabras de González Tejera, se hace una **"endeble justicia"** a los herederos peticionarios; y una vez más se ofusca infundadamente nuestro ordenamiento jurídico sucesorio, a costa de los derechos de los herederos forzosos. Por todo ello, yo disiento.

JAIME B. FUSTER BERLINGERI
Juez Asociado